[Cite as *State v. Snyder*, 2025-Ohio-4444.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                          :

    Plaintiff-Appellee,             :

  vs.                                   :

KATHERINE SNYDER,                       :

    Defendant-Appellant.            :

APPEAL NO.   C-230666
TRIAL NO.    B-2204546-B

---

STATE OF OHIO,                          :

    Plaintiff-Appellee,             :

  vs.                                   :

JOHN SNYDER,                            :

    Defendant-Appellant.            :

APPEAL NO.   C-230680
TRIAL NO.    B-2204546-A

*JUDGMENT ENTRY*

This cause was heard upon the appeals, the records, the briefs, and arguments.

The judgments of the trial court are affirmed in part, reversed in part, appellant discharged in part, and cause remanded in C-230666, and affirmed in part, reversed in part, appellant discharged in part, and cause remanded in C-230680 for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs are taxed 50% to Appellants and 50% to Appellee.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 9/24/2025 per order of the court.**

**By:**_____
          **Administrative Judge**

[Cite as *State v. Snyder*, 2025-Ohio-4444.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230666 |
| | | TRIAL NO. B-2204546-B |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| KATHERINE SNYDER, | : | |
| Defendant-Appellant. | : | |

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230680 |
| | | TRIAL NO. B-2204546-A |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| JOHN SNYDER, | : | |
| Defendant-Appellant. | : | *O P I N I O N* |

Criminal Appeals From: Hamilton County Court of Common Pleas

Judgments Appealed From Are: Affirmed in Part, Reversed in Part, Appellant
　　　　　　　　　　　　Discharged in Part, and Cause Remanded
　　　　　　　　　　　　in C-230666
　　　　　　　　　　　　Affirmed in Part, Reversed in Part, Appellant
　　　　　　　　　　　　Discharged in Part, and Cause Remanded
　　　　　　　　　　　　in C-230680

Date of Judgment Entry on Appeal: September 24, 2025

*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*,
Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Timothy McKenna*, for Defendant-Appellant Katherine Snyder,

*Arenstein & Gallagher* and *Elizabeth Conkin*, for Defendant-Appellant John Snyder.

**BOCK, Judge.**

**{¶1}** Nearly six years after eight-year-old A.S. died from a subdural hematoma on October 5, 2016, the State charged his adopted parents, codefendants-appellants Katherine Snyder and John Snyder,[1] with A.S.'s murder. The State also charged the Snyders with two counts of felonious assault and child endangerment involving A.S., and child endangerment involving several other of the Snyders' children. A jury found the Snyders guilty of felony murder, felonious assault, and several child-endangerment counts.

**{¶2}** On appeal, the Snyders raise a total of 22 assignments of error. We agree with the Snyders that the trial court committed some evidentiary errors. But none of those errors prejudiced the Snyders, either individually or cumulatively.

**{¶3}** And we agree with the Snyders that the State presented insufficient evidence to support some of the Snyders' child-endangerment convictions. But we affirm the trial court's judgment in all other aspects, including the Snyders' convictions for felony murder, felonious assault, and the remainder of the child-endangerment counts.

## FACTUAL AND PROCEDURAL HISTORY

### I.   Procedural history

**{¶4}** In September 2022, the State indicted the Snyders for A.S.'s murder and a variety of other counts.

**{¶5}** Related to A.S., the State charged both John and Kate with aggravated murder with prior calculation and design, aggravated murder of a person under 13

---

[1] As several members of the Snyder family are involved in this case, we refer to them by their first names or initials. We refer to Katherine as Kate, as the parties did below and in appellate briefing. Collectively, John and Kate are referred to as "the Snyders."

years old, purposeful murder, felony murder under R.C. 2903.02(B), and two counts each of feloniously assaulting A.S. in violation of R.C. 2903.11(A)(1), one for their conduct on October 5, 2016, and the other set of counts for their conduct from September 1, 2016 to October 5, 2016.

{¶6} The State charged both Snyders under R.C. 2919.22(A) with third-degree felony child endangerment of their children K.S., M.S., Ca.S., Co.S., and N.S. The State also charged Kate with third-degree felony child endangerment of A.S., M.S., Ca.S., and N.S. in violation of R.C. 2919.22(B)(2), and second-degree felony child endangerment of N.S.

{¶7} The Snyders' 2023 joint jury trial ran for more than a month. The jury found the Snyders not guilty of aggravated murder, purposeful murder, and child endangerment involving Ca.S. and N.S. But the jury found the Snyders guilty of felonious assault on October 5, 2016 (the day that A.S. died), felony murder (causing A.S.'s death as a proximate cause of committing felonious assault on October 5, 2016), felonious assault from September 2016 through October 2016, and child endangerment involving K.S., M.S., and Co.S. based on their violating a duty of care to the children. The jury also found Kate guilty of child endangerment involving A.S. and M.S. based on cruel abuse or torture.

{¶8} The trial court merged the Snyders' felonious-assault counts that were based on their October 5, 2016 conduct with their felony-murder counts. The court imposed identical sentences on Kate and John on the jointly-charged offenses: (a) felony murder: 15-years-to-life; (b) felonious assault for conduct from September 1, 2016, through October 5, 2016: eight to 12 years; and (c) R.C. 2919.22(A) child-endangerment involving K.S., M.S., and Co.S.: 24 months for each count. The trial court additionally sentenced Kate to 12-month sentences on each of the R.C.

2919.22(B)(2) child-endangerment counts involving A.S. and M.S. The trial court ordered each sentence to run consecutively to the other sentences. John's aggregate sentence was 29-years-to-life in prison and Kate's aggregate sentence was 31-years-to-life in prison.

## II. Facts

{¶9} On October 5, 2016, A.S., the Snyders' eight-year-old adopted son, died. The juvenile court removed the Snyders' other children from their care the next day. In November 2023, a jury found the Snyders guilty for feloniously assaulting A.S., causing A.S.'s death, and endangering several of the Snyders' seven children.

### A. *The Snyder family*

{¶10} John and Kate, husband and wife, lived in Springfield Township, Hamilton County, Ohio, with Kate's mother ("Nancy"), who lived in the basement of the Snyders' home, and the Snyders' three biological daughters, Adult Child 1, Adult Child 2 (Adult Child 1 and Adult Child 2 are collectively "Adult Children"), and K.S.

{¶11} K.S. was a medically-complex individual who, due to having meningitis as an infant, had cerebral palsy and was quadriplegic. She also had gastrointestinal issues, celiac disease, was immunocompromised, and was deaf.

{¶12} Beginning in 2013, the Snyders adopted several medically-complex children from China. Dr. Mary Staat, a pediatric-infectious-disease physician at Cincinnati Children's Hospital Medical Center ("CCHMC") was the director of the International Adoption Center ("IAC") at CCHMC. Dr. Staat assisted the Snyders with the children's adoptions. IAC offers elective services to individuals adopting international children with complex medical conditions by coordinating the adoption and providing referrals for medical care once the child arrives.

6

*R.S.*

**{¶13}** Dr. Staat met the Snyders in 2013 through IAC when the Snyders adopted R.S. Dr. Staat performed a preadoption review and determined that R.S. had a complex cardiac issue, which made it unlikely that she would survive childhood. R.S. came to the United States in March 2013, was immediately seen at the IAC, and was later admitted to CCHMC. In May 2013, the Snyders chose to have R.S. undergo surgery to attempt to repair her heart. R.S. died after surgery.

*Ca.S. and M.S.*

**{¶14}** Shortly after R.S. passed away, the Snyders contacted Dr. Staat to tell her they were adopting Ca.S. and M.S., two girls born in China. Dr. Staat performed a preadoption review for both girls. She determined that Ca.S., age eight, had a complex heart disease, was malnourished, and had a urinary-tract infection. M.S., age six, had growth and speech delays and possible hearing issues. The Snyders brought Ca.S. and M.S. to the United States in December 2014.

**{¶15}** IAC evaluated Ca.S. and made cardiology referrals, but "because of what happened with [R.S.] and her passing," Kate wanted a second opinion. At M.S.'s and Ca.S.'s six-month follow-up visit, both girls were still delayed and "weren't growing well," so Dr. Staat recommended additional services, including speech therapy. Dr. Staat testified that Kate became upset, stating, "[Y]ou just want perfect children. Everybody just wants these kids to be perfect, and they are perfect to us, and we don't need to do all of these other things. We can do everything that we need to do right at home." Dr. Staat did not have any more visits with Ca.S. or M.S.

*A.S., N.S., and Co.S.*

**{¶16}** In 2015, Kate contacted Dr. Staat about adopting N.S., a 4-or-5-year-old boy from China. Dr. Staat performed a preadoption review and had concerns that N.S.

had hydrocephalus (excess fluid in the brain).

**{¶17}** During this preadoption review, the Snyders told Dr. Staat that they were also adopting A.S., an eight-year-old boy from China. The Snyders did not need a preadoption review for A.S. because "he was a really healthy . . . cognitively normal happy kid who had a condition called arthrogryposis. . . They would . . . just bring him home and would see him in the clinic." Dr. Staat explained that arthrogryposis is a genetic condition that prevents a person's muscles, joints, and possibly nerves from configuring in a typical way, and can result in limbs being "completely attached backward [causing] . . . clubfeet . . . [and] contractures."

**{¶18}** The Snyders adopted another child, Co.S., a five-to-seven-month-old boy from China with biliary atresia, a congenital condition that causes a person's liver to form abnormally and "merely always will lead to the child . . . having liver[] failure, needing a liver transplant."

**{¶19}** In February 2016, the Snyders traveled to China and returned with N.S., A.S., and Co.S.

## B. *A.S.'s physical and mental health declined*

**{¶20}** As 2016 progressed, the Snyders reported ongoing concerns with A.S.'s physical and mental health.

**{¶21}** John brought A.S. to IAC shortly after he arrived in the United States. Though IAC offered therapy assessments, the Snyders refused occupational-therapy and mental-health evaluations. During the appointment, John expressed no concerns involving A.S.'s eating or behavior. Dr. Staat testified that A.S. weighed 17.5 kg (38.58 pounds), was "undernourished, malnourished," and was below the third percentile in weight. According to John, A.S. could use the restroom by himself and there were no concerns from a "stooling or urination standpoint."

8

{¶22} Kate brought A.S. to a follow-up visit with Dr. Staat in April 2016. Dr. Staat learned that A.S. had fractured his femur, though "things were healing and he was doing well." Kate did not report any behavioral issues with A.S., though Kate told Dr. Staat that A.S. had "stated more than once that he had adoption remorse . . . that he wishes he was still back in China." Dr. Staat testified that Kate relayed no concerns about A.S. engaging in self-harm. A.S. had lost weight from his first IAC visit—he weighed 15.59 kg (34.37 pounds) at the April follow-up visit.

{¶23} In early June 2016, Kate called Dr. Staat and reported concerns about A.S.'s behavior. Kate worried that A.S. was depressed, and he had begun acting out by smearing feces and urinating on things. Dr. Staat recommended that Kate take A.S. to IAC's therapist, Krista Long. Kate also told Dr. Staat that A.S. had broken his arm and was concerned that A.S. had an underlying bone disease. Dr. Staat referred A.S. to endocrinology and genetics.

### A.S. received mental-health treatment

{¶24} Kate took A.S. to see Long twice in June 2016. Long referred A.S. to Dr. Almeria Decker, a child and adolescent psychiatrist at CCHMC. Dr. Decker saw A.S. in late July 2016. Dr. Decker testified Kate told her that, in the previous two weeks, A.S.'s behavior had been getting much worse. Kate told Dr. Decker that A.S. was self-harming by biting the skin around his mouth and headbanging. Kate also said that A.S. was smearing feces on toys and himself. Dr. Decker observed bruises on A.S. that Kate stated were from self-harm. The Snyders put socks on A.S.'s hands to prevent scratching. Kate told Dr. Decker that A.S. was refusing to feed himself and would only eat if Kate or John fed him. Dr. Decker prescribed Zoloft and recommended that A.S. follow up with Long, but A.S. did not see Long after his initial visit with Dr. Decker.

{¶25} Kate brought A.S. to see Dr. Decker for a follow-up visit in August 2016

and reported that, while A.S.'s behavior initially had improved, it had since declined. A.S. continued to self-harm and had begun being aggressive towards his siblings. Decker started A.S. on Risperidone to address A.S.'s aggression and told Kate to take A.S. to the hospital if A.S.'s "activities of daily living" became worse. Dr. Decker discontinued A.S.'s Risperidone prescription due to concerns about A.S.'s hands and feet swelling. A.S. was scheduled to see Dr. Decker on September 30, 2016, but Kate canceled A.S.'s appointment reportedly due to a scheduling conflict. She did not reschedule the appointment.

### *A geneticist scheduled testing to rule out "brittle bone disease"*

**{¶26}** The Snyders took A.S. to see Dr. Burrows, a geneticist. Dr. Burrows expressed concern that A.S. may have "Bruck syndrome," a condition characterized by contractures—such as those present in arthrogryposis—and brittle bones. Dr. Burrows scheduled genetic testing for October 12, 2016, to test for the condition.

**{¶27}** After A.S. visited Dr. Burrows, he paged Dr. Staat regarding "concerns" for A.S. Dr. Staat spoke with Kate, who told Dr. Staat that "things had gotten much worse with [A.S.]" and that she was open to getting more help. Dr. Staat recommended having A.S. admitted to CCHMC for an evaluation of his nutrition and behavior. Kate told Dr. Staat that "it wasn't good timing, but she would meet with our therapist again."

### C.  *Children's nutrition, vaccines, and other concerns*

**{¶28}** A neighbor testified that she had been in the Snyder home around mealtime four times. Kate told the neighbor that all the Snyders except John had food allergies. As it turned out, medical testing revealed that the children did not have most of the allergies that Kate claimed they had. K.S. had celiac disease and N.S. had a condition called "G6PD," which prevented him from eating fava beans. A doctor placed N.S. on a gluten-free diet in December 2016.

*K.S.'s weight*

**{¶29}** From 2008 through 2016, K.S. gained minimal weight. In 2008 at age seven, K.S.'s growth chart showed that she weighed approximately 22 pounds. In October 2016, when K.S. was 14 years old, the juvenile court removed K.S. from the Snyders' custody after A.S.'s death. Then, she weighed around 27 pounds. Once removed from her parents' custody, K.S. remained hospitalized until May 2018 due to her complex medical issues. Between K.S. leaving the Snyders' home at 14 years old and her reaching 15-and-a-half years old, K.S.'s weight increased to 44 pounds. After this period of weight gain, K.S.'s weight plateaued.

*Doctors believed Co.S. would need a liver transplant*

**{¶30}** Dr. Staat testified that biliary atresia "nearly always will lead to the child . . . having liver[] failure, needing a liver transplant." CCHMC staff believed that Co.S. would likely need a liver transplant eventually. Therefore, CCHMC told the Snyders that they wanted "to bump up [Co.S's] weight fairly quickly" so Co.S. would be healthy for a transplant. To meet this "fairly quick[]" weight gain, CCHMC staff wanted Co.S. to gain 30 grams of weight per day. But Co.S. only gained six-to-eight grams of weight per day. So, CCHMC recommended placing a nasogastric tube ("NG tube") to provide N.S. adequate nutrition. Dr. Staat testified that Kate was uncomfortable working with the CCHMC transplant team and wanted a second opinion, which Staat agreed was "totally appropriate." The Snyders took Co.S. to the Children's Hospital of Philadelphia ("CHOP") to evaluate his liver. Doctors there also recommended an NG tube for Co.S., and it placed an NG tube in September 2016. The medical records show that a week later, the NG tube was out, and Kate did not allow a nurse to place it on Co.S. during a home visit. When the juvenile court removed Co.S. from the Snyders' custody in early October 2016, his NG tube was not in place.

{¶31} Dr. Staat testified that CCHMC told the Snyders that, for Co.S. to be on the liver-transplant list "at least at [CCHMC]," everyone who lived with Co.S. had to be current with vaccinations. Some of the Snyder children needed a chickenpox vaccine. Dr. Staat testified that Kate expressed concern about K.S. being immunocompromised, and that K.S. would contract chickenpox from one of the other children if they were vaccinated. But Dr. Staat testified that because K.S. previously had chickenpox, she was already protected from contracting chickenpox again. The Snyders did not vaccinate Co.S. for chickenpox.

{¶32} At the time of the trial, about seven years after being removed from the Snyders' custody, Co.S. had not received a liver transplant.

### Nancy emailed Kate's sister

{¶33} Kate's sister ("Melissa") testified that Nancy (Kate and Melissa's mother) had emailed her in May 2016. (The email and its responses collectively are the "Nancy and Melissa emails.") Over the Snyders' objections, Melissa testified about the email. She indicated that Nancy said, "there was a lot of yelling in the house, that they were being disciplined harshly, that they weren't being nice, and they were overreacting to toileting problems." And Melissa testified that she had "a fear about what was happening to the children in the Snyder home" because her "mom was not prone to making up stories." Melissa testified she did not think Nancy was lying when she wrote the email.

{¶34} The Nancy and Melissa emails were read to the jury. We share the content of those emails in the analysis section below.

### Neighbors observed the Snyders

{¶35} A neighbor testified that the Snyders told her that because M.S. had begun wetting her bed, Kate "put [M.S.] in the tub and she would have to clean herself

off and wash her pajamas so she would learn not to wet in her pajamas anymore." When M.S. continued to wet the bed, Kate put a "blowup pool, is the way she explained it, and [M.S.] would sleep in there with her pillow and blanket so she wouldn't ruin the mattress, because she was starting to wet more."

**{¶36}** The Snyders also told a neighbor that A.S. had been diagnosed with brittle-bone disease, his bones would break easily, and he had broken his leg on the landing of the stairs. The neighbor testified that over time, the Snyders began to complain more about A.S. disobeying their rules and not listening. Kate told the neighbor that A.S. was "wetting and he started doing number two, and she said he would smear it." Kate told the neighbor she used duct tape to keep A.S.'s diaper on.

**{¶37}** On October 4, the day before A.S. died, a neighbor saw John and learned that Kate had taken A.S. to CCHMC to be admitted to the psychiatric ward. That neighbor testified, "I said, Gosh that's terrible. . . . And [John] kind of shrugged his shoulders. He said, 'That's okay. No one likes him anyway.'"

### D. *Kate took A.S. to CCHMC's emergency department*

**{¶38}** The day before A.S.'s death, Kate took him to CCHMC's emergency department ("ED") due to concerns about A.S.'s continued behavioral decline. ED staff determined that A.S. "was in crisis" and transported him to CCHMC's College Hill campus ("College Hill Campus"), which provides pediatric inpatient and outpatient psychiatric hospital services. College Hill Campus admitted A.S.

*College Hill Campus psychiatric staff wanted to send A.S. back to the ED*

**{¶39}** Dr. Sorensen, a CCHMC psychologist and director of behavioral programing for CCHMC's Behavioral Safety Team, testified as an expert in "psychology and severe behavioral treatment, including self-injury behaviors."

**{¶40}** Dr. Sorensen performed the initial intake for A.S. when he was admitted

to the College Hill Campus. Kate told Dr. Sorensen that A.S. was headbanging, scratching himself, picking at his skin, pinching himself, destroying property, yelling and screaming, urinating in places other than the toilet, smearing feces, and vomiting.

**{¶41}** Dr. Sorensen explained that College Hill Campus staff do not immediately perform a full-body exam of new patients. Dr. Sorensen could see abrasions on A.S.'s head, including a bruise on A.S.'s "central forehead region," as well as socks on his hands. Kate told Dr. Sorensen that the Snyders put socks on A.S.'s hands to prevent self-pinching and scratching, and "at times they had taped the socks that were on his hands to his pants." Dr. Sorensen testified that this was not a recommended treatment for a child engaging in these behaviors: "It is not something we want them to continue to do once they are educated otherwise. I think families can do hard things when they are trying to keep a child safe, but in a situation like this it can cause more trauma." Dr. Sorensen stated that families commonly put socks on a child's hands and she did not consider this to be abusive, as long as the socks are not too tight or on the hands for too long, which could result in a decline "in functioning."

**{¶42}** Given A.S.'s physical presentation, Dr. Sorensen had concerns about her ability to treat A.S. She explained that the treatment team was concerned about A.S.'s "appearance of being malnourished, which can cause a starving brain . . . So, it needs to be addressed first while we focus on safety and then we can do the behavioral treatment once we make sure their brain is nourished." Accordingly, Dr. Sorensen wanted A.S. assessed for "refeeding" at CCHMC's main campus. (Refeeding is the process of treating a malnourished child, where medical providers "balance those feeds and gradually increase them" to avoid "throw[ing] off the body's electrolytes," which may be "a serious medical condition.") But according to Dr. Sorensen, Kate was reluctant to take A.S. to CCHMC's main campus for refeeding because "she had a

14

previous experience with another child that did not go well." Kate expressed concerns about A.S. being institutionalized due to mental-health issues, which Dr. Sorensen stated "is something we can see in children who are adopted at times." Before Dr. Sorensen left College Hill Campus for the day, College Hill Campus staff had called for transportation to take A.S. to the main campus.

### *On-call pediatrician did not observe acute medical issues*

**{¶43}** Dr. Kevin Reidy was an on-call pediatrician at College Hill Campus. Dr. Reidy assessed A.S.'s physical health after A.S.'s treatment team became concerned about A.S.'s status.

**{¶44}** Dr. Reidy testified that his physical exam of A.S. demonstrated that A.S.'s medical needs could have been met at College Hill Campus, and it was not medically necessary for A.S. to return to the ED that night. Dr. Reidy's exam showed that A.S.'s body temperature the entire day was at the "low end of normal," his oxygen saturation was at 100 percent, his eyes were reactive, and his neck was supple, which indicated that A.S. did not have a head injury. A.S.'s lymph nodes were not swollen, his lungs did not show signs of pneumonia, and A.S. told Dr. Reidy that he was not in any pain. Dr. Reidy testified that, given A.S.'s presentation, there was nothing to indicate that A.S. required a CT scan or showed signs of sepsis, MRSA, or meningitis. Dr. Reidy did see injuries on A.S.'s hands and skin, which he stated were consistent with self-harm. The exam showed that A.S.'s various skin lesions did not show signs of secondary infection. A.S.'s weight was 14.6 kilograms (32.19 pounds).

**{¶45}** Though Dr. Reidy believed A.S. could have remained at College Hill Campus, he explained that the psychiatric team was concerned about A.S.'s condition and wanted A.S. to return to the ED. Dr. Reidy believed that Kate's plan was to contact A.S.'s outpatient psychiatrist in the morning "and take whatever next steps were going

to happen there as far as that future schedule admission." Dr. Reidy was comfortable with Kate leaving with A.S. and following up the next day with A.S.'s outpatient team. He did not see any reason to believe that A.S. would die the next day.

**{¶46}** Kate returned home with A.S.

### E. *A.S. died at CCHMC*

**{¶47}** On October 5, 2016, at 12:44 p.m., Kate called 911 and emergency medical staff were dispatched to the Snyder home. An EMT paramedic testified that when he arrived at the Snyders' home minutes after the 911 call, he saw Kate outside carrying A.S. The paramedic could "tell that child was in trouble" and determined that A.S. had a very low heart rate. At CCHMC, staff transported A.S. to the pediatric intensive care unit ("PICU").

**{¶48}** Dr. Sue Poynter testified as an expert in pediatrics and pediatric critical care. Dr. Poynter was working at CCHMC's PICU when A.S. arrived "in a significantly critical condition." She testified that A.S.'s heart had stopped in the ED and he received "a prolonged resuscitation." PICU staff performed a CT scan in the PICU and determined that A.S. had a "significant, likely unsurvivable, brain injury." A neurosurgeon determined that nothing could be done to save A.S.

**{¶49}** Dr. Poynter testified that when A.S. initially arrived, "he had some lab work that was drawn" to rule out infection. But after viewing the CT scan, Dr. Poynter did not believe "infection was a major player." Doctors considered giving A.S. antibiotics, but after they saw A.S.'s head trauma and determined he would not survive, they decided against it. Dr. Poynter noted that the "family, they did not want heroic measures." Two days after his death, A.S.'s blood draws came back positive for a staph infection.

**{¶50}** A.S. stayed in the PICU for between five and seven hours. CCHMC kept

16

A.S. on life support "[b]asically from the time he arrived in the ICU until the time we had some more conversations with his parents and were able to get the rest of the kids in to see him."

**{¶51}** CCHMC removed A.S. from life support and A.S. died in the PICU.

**F. *PICU doctor suspected abuse caused A.S.'s death***

**{¶52}** The Snyders stated that A.S. had been "relatively normal that morning," had taken a nap, and then they found him "less responsive but . . . they had not been concerned about him." Dr. Poynter began to suspect that the Snyders' explanation of what happened was "not a story that matched [A.S.'s] injuries." She observed large "decubitus ulcers," commonly known as bedsores, on A.S.'s right shoulder and lower back. (As will be discussed, advanced bedsores may be fatal.) Dr. Poynter explained that bedsores normally develop "over days to weeks" and A.S.'s large sores would not have developed during his relatively short stay at College Hill Campus the day before he died. Dr. Poynter believed that A.S. appeared malnourished.

**{¶53}** Dr. Poynter testified,

This is the story from Mrs. Snyder who reported that [A.S.] was fine that morning and then woke up from a nap but didn't really wake up and came in basically full arrest in the ED and has a significant life-ending head injury with no explanation. There's a missing -- those parts are not congruent. Those pieces don't fit together.

**{¶54}** Dr. Poynter contacted Dr. Kathi Makoroff, the medical director at CCHMC's Mayerson Center for Safe and Healthy Children ("the Mayerson Center") to report A.S.'s death as suspicious.

**G. *A six-year investigation***

**{¶55}** Lieutenant Matthew Wilcher of the Springfield Township Police

Department visited CCHMC the night A.S. died. Wilcher spoke with the Snyders, who told consistent stories about what had happened on both October 4 and 5. The Snyders told Wilcher that Kate took A.S. to the hospital on October 4 because A.S. put "himself in a position that suggested he was trying to put his face under water while in the bathtub."

{¶56} The Snyders told Wilcher that on the morning he died, A.S. had soiled himself overnight, so Kate put him in the bath. Kate left the home at 10:30 a.m. to take some of the other children to appointments. Before she left, Kate took A.S., who the Snyders said appeared to be fine, to John's office. John was on a conference call from around 9:30-11 a.m. John told Wilcher that after the call, A.S. was asleep, was not moving, and did not want to wake up. John called Kate and they decided that A.S. was probably tired and "that he has trances that he can go into and that he was probably just doing that."

{¶57} Kate told Wilcher that when she returned home around noon, she checked on a sleeping A.S. and attempted to wake him. Kate asked A.S., "Are you still mad at mom?" and A.S. nodded yes. Kate told Wilcher that she checked A.S.'s eyes, which appeared normal and reactive. She said that A.S. was making other noises "that were suggesting that he was acknowledging that they were talking to him." After 45 minutes, Kate determined that something was wrong and called 911.

{¶58} The Snyders allowed law enforcement in their home the night A.S. died. Lieutenant Brian Uhl met John at the house. Uhl photographed A.S.'s room, which had a child's bed and a "child containment kind of area, Pack 'n Play of sorts." The Pack 'n Play contained socks and medical tape. Uhl did not take pictures of other parts of the house because he was "limited to where we would have been able to have gone through the house." Uhl's notes from the visit were lost due to a server crash in 2018.

**H.** *The coroner ruled A.S.'s death a homicide*

**{¶59}** Dr. Mona Gretel Case Harlan Stephens, a Hamilton County Coroner employee, performed A.S.'s autopsy.

*A.S. had a large subdural hematoma*

**{¶60}** Dr. Stephens located a "large left acute subdural hematoma, which is just bleeding between the dura, which covers the skull, and the pia arachnoid, which covers the brain." Dr. Stephens identified the hematoma as the cause of A.S.'s death.

**{¶61}** Dr. Stephens noted a bruise on the lower-right side of the back of A.S.'s head that "was rather low for the average headbanging-type bruise in a child or an adult." The bruise was "fresh," but Stephens could not state how recently it had occurred. Dr. Stephens believed that a four-centimeter flat surface struck the back of A.S.'s head in this location, causing the fatal hematoma.

**{¶62}** Stephens explained that if a head injury results from the head moving and striking something, "usually that causes the bruise directly where [the head is] hit, and then the response by the brain with the hemorrhage is transmitted to the other side." But if the injury results from a blow from an object, the bruise and hemorrhage usually appear where the blow landed.

**{¶63}** Dr. Stephens identified a bruise on A.S.'s forehead. She opined that the forehead bruise did not cause A.S.'s hematoma because the bruise was older and already in the process of healing, while "the subdural hemorrhage was acute . . . meaning that it was fresh. It had not been there long enough to be . . . worked upon." Dr. Stephens explained that an "acute" injury could be up to 48-hours old.

**{¶64}** At College Hill Campus the day before he died, A.S. drank 24 ounces of milk. Dr. Stephens opined that because A.S. drank without any difficulty, he did not have the hematoma when he presented at CCHMC the day before he died.

*A.S.'s lungs had widespread pneumonia*

**{¶65}** Dr. Stephens's autopsy revealed that A.S.'s lungs were very heavy and had "widespread pneumonia." She testified that bronchopneumonia is "usually caused by aspiration" of the contents of the stomach into the lungs, which is referred to as aspirational pneumonia. But Dr. Stephens did not state that A.S. had aspirational pneumonia because she did not "find any foreign materials in . . . the lungs. So it's aspiration-type pneumonia, but I couldn't find foreign aspirated material." She explained that signs of inflammation in response to aspirational pneumonia can occur within 15 minutes and bacteria can continue to grow postmortem, even though inflammation ceases.

**{¶66}** Based on her review of A.S.'s medical records, Dr. Stephens believed that A.S. did not have sepsis, aspirational pneumonia, or a subdural hematoma during his October 4 visit to CCHMC.

*Dr. Stephens found additional medical issues*

**{¶67}** Dr. Stephens found several large "decubitus ulcers," commonly known as bedsores, on A.S.'s body. She identified some of the bedsores as approaching "grade 4" bedsores, which are dangerous because the sores are very deep, can become infected, and can be fatal. Dr. Stephens testified that a bedsore on A.S.'s lower back had "necrotic appearing tissue," which is skin that "had broken down and the tissue under it had also broken down." Dr. Stephens stated that the sore "did not show marked oozing and it didn't show pus, but certainly it was broken skin. So it can be a source for infection." She testified that the bedsore did not show signs of healing and "[i]t looked like a very fresh" bedsore.

**{¶68}** The autopsy also indicated that A.S. was malnourished. Dr. Stephens explained that while normal human fatty tissue is "very yellow," A.S.'s was pale and

minimal, which is consistent with a person who is malnourished. Dr. Stephens also testified that A.S.'s adrenal glands appeared consistent with "someone that is chronically ill. So long-term illness, long term stress from illness."

**{¶69}** Although Dr. Stephens testified that A.S.'s bone appeared to have "approximately normal bone strength," she could not rule out "osteogenesis imperfecta or brittle bone."

**{¶70}** Dr. Stephens tested A.S. for Lesch-Nyhan syndrome, a genetic disorder characterized by an abnormal uric acid metabolism, which can cause a child to self-mutilate and can also cause gout and neurodevelopmental problems. The condition typically presents in children as early as six months and will be "quite obvious" by the age of two. Dr. Stephens testified that A.S.'s postmortem uric acid levels were not elevated. Elevated postmortem uric acid levels would have suggested A.S. had Lesch-Nyhan syndrome, but "we don't know what death does to uric acid concentration in the body."

**{¶71}** Dr. Stephens finalized her autopsy report in February 2017 and ruled A.S.'s death a homicide caused by a nonaccidental subdural hematoma.

### I. *Child-abuse specialist diagnosed A.S. with abuse*

**{¶72}** Dr. Kathi Makoroff testified that she reviewed A.S.'s medical records and spoke with various doctors, including Drs. Staat, Poynter, Burrows, Stephens, and Marguerite Caré, a radiologist. Based on her review, Dr. Makoroff diagnosed A.S. with physical abuse. Dr. Makoroff, Dr. Stephens, Lieutenant Wilcher, and others attended a meeting at the Mayerson Center the week after A.S.'s death, where Dr. Makoroff stated that she believed A.S.'s death was nonaccidental.

### J. *Children disclosed seeing Kate hit A.S.*

**{¶73}** The juvenile court removed all of the Snyders' minor children from their

custody the day after A.S.'s death.[2] In the months and years after their removal, some of the children disclosed witnessing the Snyders abuse A.S.

*M.S., N.S., and Ca.S. described abuse to a foster parent*

**{¶74}** M.S., N.S., and Ca.S. were placed with a foster parent, Brenda, for approximately 19 months beginning in October 2016. Over the Snyders' objections, Brenda testified that on December 19, 2016—more than two months after they left the Snyders' custody—M.S. acted out what Brenda interpreted as Kate smashing A.S.'s head against the floor. N.S. then told her he would show her what had happened, ran to the bathtub where he laid down limp, ran to the window, and told her that a firetruck came. Ca.S. told her, "'Mom hit [A.S.]'s head.' Hit head. (Demonstrating.). And she kept shaking. 'Yeah, like that, yeah.' (Demonstrating.)" Brenda called the children's social worker to report the disclosure.

*Mayerson Center employee interviewed M.S. and N.S.*

**{¶75}** Two days after her disclosure to Brenda, Cecilia Hicks, a Mayerson Center social worker and forensic interviewer, met with M.S. The State played a recording of M.S.'s entire unredacted interview at trial—the Snyders did not object. In the interview, M.S. indicated that "mama" hurt A.S. Hicks gave M.S. a doll, which Hicks said represented A.S., and asked M.S. to show her "how his body was when [A.S.] got hurt." M.S. hit the back of the doll's head against a table. M.S. also put the doll's hand against the doll's face and stated it was "eating."

**{¶76}** Hicks interviewed N.S. a few weeks later. N.S. was five years old at the time and did not disclose any abuse. She believed that N.S.'s developmental delays

---

[2] For a recitation of the Snyders' lengthy custody battle for their children, *see In re S Children*, 2024-Ohio-538 (1st Dist.). At trial, the trial court generally precluded the parties from referencing the juvenile court case.

prevented him from making disclosures. Hicks stated that N.S. was not "interviewable" and that she should have stopped the interview after the first ten minutes. She determined that N.S. was "uninterviewable" because he would "answer with the last thing that I said or – and sometimes he said he didn't know." Hicks agreed that, in the interview, she asked N.S. who hurt A.S. and N.S. responded, "[A.S.'s] hurting himself." Hicks also asked N.S. if someone hurt A.S., and N.S. responded, "Not hurting [A.S.]."

### K. *The children began therapy*

{¶77} Melissa (Kate's sister) lived in New York. At Kate's request, Melissa became Ca.S., M.S., N.S., and Co.S.'s foster parent. Melissa testified that the children initially did not like to take showers and were afraid that the water would be cold. Melissa spoke with M.S., N.S., and Ca.S. about "their experience with peeing" in which "peeing was equated with cold showers and trauma."

{¶78} Melissa took the children to therapy. Deborah Dube, a psychiatric social worker, provided therapy to Co.S., Ca.S., M.S., and N.S. for five years.

{¶79} Dube testified that her role as the children's therapist was to meet with the children and "help them given that they're not with their parents. Plus the goal . . . might have been for, like, reunification or keeping them connected with their parents." Initially, John and Kate attended the sessions.

{¶80} Dube testified that Ca.S., M.S., and N.S. had posttraumatic stress disorder ("PTSD"). According to Dube, the source of N.S.'s PTSD was "the knowledge that his brother was hurt in the home, and it led to them being taken out." Dube similarly stated that, in her professional opinion, the source of M.S.'s trauma was "that when she witnessed what happened to her brother and she was also treated punitively . . . If she wet herself she was thrown into a cold shower . . . She was locked in a room

. . . sometimes for the whole day and says that she wasn't fed."

### L. *The State indicted the Snyders*

**{¶81}** Wilcher testified that during the investigations, he received updates from Melissa about the children and their progress. Melissa called Wilcher in August 2022 to tell him that Kate had showed up at Melissa's home. At some point, Wilcher learned that the children had made "additional disclosures" about cold showers and mistreatment, which prompted him to travel to their New York foster home in September 2022 to interview them. Shortly after Wilcher's trip, the State indicted the Snyders.

### M. *Two children testified against the Snyders*

**{¶82}** The trial court held an in-camera competency hearing and determined that M.S., N.S., and Ca.S. were competent to testify at trial. Only M.S. and N.S. testified. M.S. testified with the help of two sign-language interpreters. M.S. also answered some questions by writing the answers on paper. M.S. and N.S. both took breaks during their testimony. At the time of the trial, M.S. was 14 years old and N.S. was 12 years old.

#### *M.S. testified that Kate and John hit A.S. on October 5*

**{¶83}** When asked if she was home on October 5, 2016, M.S. replied, "Yeah. I think so. I don't know." Then when the State asked M.S. if she was in the house when something happened to A.S., M.S. said, "[Y]eah." To describe what happened to A.S., M.S. wrote, "Kate and John hit [A.S.] head at wall." M.S. demonstrated with a stuffed bear and a water bottle: "This is [A.S.], the bear (indicating). This is [A.S.] . . . Here's the wall. Say the water bottle is the wall (indicating). And then [A.S.'s] head did that (indicating) but more hard. Harder." M.S. confirmed that John and Kate hit the back of A.S.'s head against the wall.

**{¶84}** The State asked if A.S. had bathroom accidents and M.S. replied that he did. M.S. did not know whether A.S. had an "accident where he pooped" on the day he died.

**{¶85}** M.S. said that after Kate and John hit A.S.'s head on October 5, they put him in a hallway and left him there. When the State asked how long A.S. was in the hallway, M.S. responded, "I don't know. Ten minute." M.S. later testified that A.S. was left alone for a long time. She stated that no one checked on A.S. while he was in the hallway. M.S. did not remember the police or fire department coming to the house.

**{¶86}** M.S. testified that the Snyders made her take cold showers when she urinated in her pants. She said that the Snyders would not feed her or A.S. because "Me and [A.S.] was doing too bad thing." M.S. described the Snyders' hitting her on the arm because "they're mad" and would say, "I hate you," as they hit her. M.S. said she slept on a "swimming bed," which was "kind of" like "a regular mattress."

**{¶87}** When asked if she feared the Snyders, M.S. answered, "Maybe kill me." The State asked M.S. why they would kill her and M.S. explained, "They killed my brother." M.S. testified that the Snyders told her not to tell people things.

**{¶88}** On cross-examination, the Snyders asked M.S. if she remembered telling Wilcher that, in response to Wilcher's question, "your parents wouldn't feed you sometimes for an hour," M.S. replied, "Yeah." The Snyders asked, "So it was only an hour that they didn't feed you?" M.S. replied, "An hour, yeah. An hour."

*N.S. did not remember A.S. being hurt on October 5*

**{¶89}** N.S. testified that it was terrifying living in the Snyders' house because they yelled at everybody. When asked what the Snyders did to his siblings, N.S. answered, "Cold showers, not feeding them. Like they wouldn't feed them for a day or two." N.S. clarified that the Snyders did these things to A.S., M.S., and Ca.S. He

testified that when Ca.S., M.S., and A.S. had "bathroom accidents," the Snyders would yell at the children. The State asked N.S. if the Snyders ever hurt any of his siblings and N.S. said, "Sometimes they would, like, hurt them in a way . . . But I don't remember." N.S. could not remember what happened to A.S. on October 5, 2016: "I remember him dying, but I don't remember the backwards part. So, no."

**{¶90}** But N.S. did remember that the Snyders would "[l]ike, physically hurt [A.S.]. Like, punch him and stuff . . . Like, they would more use their hands than their feet and all of that stuff." N.S. testified that the Snyders said that A.S. was "the worst son in the world." N.S. also remembered the Snyders not feeding A.S. and testified that Co.S. was probably the only one who "got the regular amount of food."

### N. *The Snyder's defense*

#### *Fact witnesses*

**{¶91}** In their defense, the Snyders called several individuals who testified that the Snyders were kind parents who never yelled at or physically disciplined their children. The Snyders also called multiple witnesses who described witnessing A.S. frequently engage in self-harm, including hitting both the front and back of his head against hard surfaces, and that the Snyders would actively intervene to stop A.S.

**{¶92}** Adult Children testified in the Snyders' defense. Adult Child 2 described the adoption processes for the children and stated that she went to China with Kate to get the children. She described the orphanage in China and noted that it did not have hot running water. Adult Children testified that A.S. struggled to adjust to coming to the United States and exhibited erratic behaviors, self-harmed, and hit his siblings. Adult Child 2 testified that on one occasion, she saw A.S. throw his head back into a bathroom wall, denting the drywall. Adult Child 2 stated that Kate taped A.S.'s diaper on him by putting medical tape across the tabs on the front of the diaper. Adult

Children testified that the Snyders did not yell at or hit their children, imposed discipline through short time outs, and did not make the children take cold showers or withhold food.

**{¶93}** Adult Child 2 testified that she was in the Snyders' home on October 5. She described a series of events similar to those that Kate and John reported to Wilcher when he met them shortly after A.S.'s death. Adult Child 2 stated that she was downstairs when Kate gave A.S. a bath in the downstairs bathroom and did not observe an assault.

*Defense experts*

**{¶94}**Dr. Roland Auer was a certified neuropathologist at the Royal University Hospital, which is affiliated with the University of Saskatchewan. Dr. Auer also earned a Ph.D. in "brain damage" in Sweden. The trial court qualified Dr. Auer as an expert in forensic neuropathology. Dr. Auer testified that untreated sepsis, combined with a subdural hematoma caused by A.S.'s headbanging and the widespread pneumonia in A.S.'s lungs, caused A.S.'s death. Dr. Auer reviewed slides of A.S.'s brain and identified large clumps of bacteria and neutrophils, a type of white blood cell. This led Dr. Auer to conclude that the bleeding in A.S.'s brain had been ongoing for several days. Dr. Auer concluded that A.S. had Lesch-Nyhan syndrome based on A.S.'s reported self-mutilating, depression, aggression towards siblings, and apparent insensitivity to pain. Dr. Auer explained that Lesch-Nyhan syndrome is identified through genetic testing and that Dr. Stephens performed an incorrect test to rule out the syndrome.

**{¶95}**The trial court qualified Dr. Peter John Dehnel, a pediatric hospitalist, as an expert in the field of general pediatrics. Dr. Dehnel believed that A.S. had several underlying medical conditions that put him at risk for a "bad outcome." He believed that A.S. had an overwhelming infection caused by MRSA, which likely originated

from his pneumonia. Dr. Dehnel explained that the pneumonia caused a "disorder of his coagulation systems, and [A.S.] likely had existing subdural fluid from a long time ago, which then had an acute amount of bleeding in his skull, which then caused . . . the increase in the size of the subdural, the herniation," resulting in A.S.'s death. Dr. Dehnel believed that Bruck Syndrome "may well have applied to [A.S.'s] situation." He explained that Bruck Syndrome is a genetic disorder that causes bones to break more easily and is associated with arthrogryposis, "and probably related to his behavioral issues as well." Based on his review of A.S.'s October 4 medical records, Dr. Dehnel believed that it was "far more likely than not that" A.S. had a developing pneumonia at the time.

{¶96}Finally, Dr. Stuart Bassman, a psychologist, testified as an expert in psychology with an emphasis on forensic interviewing and child abuse, trauma, diagnosis, and treatment. Dr. Bassman reviewed M.S.'s and N.S.'s Mayerson Center interviews and testified that he had concerns with the methodology employed by Hicks. He concluded that M.S.'s and N.S.'s interviews did not meet the guidelines of an adequate forensic interview.

{¶97} The jury found the Snyders not guilty on a few charges and guilty on others. The trial court imposed sentences on the Snyders. The Snyders appealed the trial court's judgments.

### ANALYSIS

{¶98} Collectively, John and Kate raise 22 assignments of error. Because we review multiple issues under the same standard of review, we begin by explaining those duplicative standards of review. For issues where our standard of review is unique within this opinion, we explain that review within the assignment of error. Next, we address Kate's assignments of error, noting where John raises the same

28

issues. Then we turn to John's remaining assignments of error. As Kate adopted John's brief in its entirety, we analyze his assignments of error as they relate to both Kate and John. Finally, we address Kate's cumulative-error argument.

## Standards of Review

### I. Abuse of Discretion

**{¶99}** We review challenges of rulings over which a trial court has discretionary authority for an abuse of discretion. *See Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

**{¶100}** When a trial court "exercise[es] its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority," its ruling constitutes an abuse of discretion. *Id.* A trial court abuses its discretion when it acts arbitrarily, unreasonably, or unconscionably. *State v. Bansobeza*, 2025-Ohio-2704, ¶ 11 (2d Dist.). We will not find an abuse of discretion simply because we may have reached a different conclusion. *State v. Smith*, 2025-Ohio-2166, ¶ 24 (2d Dist.) But trial courts lack discretion to commit errors of law. *Abdullah* at ¶ 39.

### II. Harmless Error

**{¶101}** Upon our determination that a trial court committed an error, we must determine whether that error was harmless. *See State v. Steelman*, 2018-Ohio-1732, ¶ 41 (1st Dist.). Under Crim.R. 52(A), "harmless error" means any error that does not affect a defendant's substantial rights.

**{¶102}** In analyzing whether an error was harmless, we consider whether (1) the improperly-admitted evidence prejudiced the defendant, (2) the trial court's error was "not harmless beyond a reasonable doubt," and (3) after removing the improper evidence, the remaining properly-admitted evidence overwhelmingly supports a guilty verdict. *State v. Smith*, 2019-Ohio-3257, ¶ 23 (1st Dist.), citing *State v. Morris*, 2014-Ohio-5052, ¶ 27-28. The State bears the burden of demonstrating that an error is

harmless. *State v. Harris*, 2015-Ohio-166, ¶ 36.

### III.   Plain Error

{¶103}  When a party challenges an issue that it failed to raise before the lower court, we review it for plain error. *State v. Phillips*, 2024-Ohio-2310, ¶ 8 (1st Dist.). The party asserting plain error bears the burden of demonstrating its existence. *State v. Echols*, 2024-Ohio-5088, ¶ 50.

{¶104}  To establish plain error, an appellant must show that the trial court committed an obvious error and that a reasonable probability exists that the error affected the outcome of the trial. *State v. Knuff*, 2024-Ohio-902, ¶ 117; *State v. Warner*, 2024-Ohio-1949, ¶ 26 (1st Dist.). Courts should exercise "the utmost caution" and only notice plain error "under exceptional circumstances and only to prevent a manifest miscarriage of justice." (Internal citation omitted.) *Echols* at ¶ 50. And even when defendants meet their burden to show that an obvious error affected the outcome of their trial, "[a]n appellate court has discretion to notice plain error and therefore 'is not required to correct it.'" *State v. Montgomery*, 2022-Ohio-2211, ¶ 77 (Kennedy, J., dissenting), quoting *State v. Rogers*, 2015-Ohio-2459, ¶ 23.

### IV.   Ineffective assistance of counsel

{¶105} A defendant is entitled to the effective assistance of counsel under the federal and Ohio constitutions. *State v. Collins*, 2024-Ohio-5112, ¶ 68 (1st Dist.). Defendants bear the burden of showing that counsel was ineffective. *State v. Drain*, 2022-Ohio-3697, ¶ 95, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

{¶106} When we review if trial counsel provided ineffective assistance, we consider whether the appellant showed "both that their counsel's performance was deficient, and that had counsel been effective, the outcome of the proceedings would have been different." *State v. Hurt*, 2024-Ohio-3115, ¶ 81 (1st Dist.). A licensed

attorney is presumed to be competent. *Id.*

### Kate's Assignments of Error One to Eight and Ten

## I. Hearsay evidence

**{¶107}** Kate's first assignment of error asserts that the trial court abused its discretion by (1) allowing Brenda, the children's former foster parent, to testify about M.S.'s and N.S.'s disclosures, based on the excited-utterance exception under Evid.R. 803(2), and (2) admitting the Nancy and Melissa emails under Evid.R. 803(3), the then-existing mental-, emotional-, or physical-condition exception. John raises the same issues in his second (the Nancy and Melissa emails) and third (children's statements to Brenda) assignments of error.

**{¶108}** We agree with the Snyders that the trial court erred in admitting this evidence. But we hold that these errors did not prejudice the Snyders.

### A. *Hearsay definition*

**{¶109}** Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C). A statement is "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Evid.R. 801(A). Generally, hearsay is inadmissible at trial unless it falls within an enumerated exception. Evid.R. 802. We review hearsay rulings for an abuse of discretion. *State v. McCloud*, 2024-Ohio-2190, ¶ 26.

### B. *Excited-utterance exception*

#### 1) *The children's disclosures to Brenda*

**{¶110}** The day after A.S. died, the juvenile court removed the children from the Snyders' custody and placed M.S., N.S., and Ca.S. in foster care with Brenda. At trial, Brenda testified that nearly two-and-a-half months after they were in her care,

[M.S.] came to me and . . . she was very upset. She climbed up on my lap facing me and signed "[A.S.]" and wanted to tell me something.

And she started talking, but I couldn't understand her. And she was upset. She was flailing her hands. I'm like, "[M.S.], I can't understand you. Just show me."

[S]he wanted me to go to the floor. So I sat down on the floor, and she slammed me back on the floor and jumped on my stomach facing me. . . .

And she smashed my head down on the ground and just kept smashing it.

She finally stopped, and [N.S.] says, "I'll show you." He laid limp on the floor beside me. And . . . he goes, "Then I'll show you what happened." And he ran . . . to the bathroom, and climbed in the tub and he laid limp in the tub. He said, "Mom and dad gave him a bath." Then he jumped out and ran to the window, and he said, "Then a fire truck come."

And I was dumbfounded, shocked. I'll never forget it. It was the most horrifying -- it was like when they started they couldn't stop. [M.S.] was out of control. She was just, like, she was in a rage.

{¶111} Brenda explained that M.S.'s disclosure was "out of the blue" and lasted, "Minutes, minutes. It was just like a rage, like, when it started it couldn't stop with her; and then [N.S.] just followed, and he was all excited, and he was running."

{¶112} Brenda testified that Ca.S. affirmed her siblings' statements. She said, "And [Ca.S] was sitting on the couch, and she said, 'Mom hit [A.S.]'s head.' Hit head. (Demonstrating.) And she kept shaking. 'Yeah, like that, yeah.' (Demonstrating.)"

*2) Excited-utterance hearsay exception*

**{¶113}** Regardless of whether the declarant is available, Evid.R. 803(2) permits a trial court to admit a hearsay statement if it is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

**{¶114}** Evid.R. 803(2)'s exception applies when (1) the declarant witnessed an event sufficiently startling to cause the declarant "nervous excitement," (2) although the statement need not be strictly contemporaneous with the event, it must have been made before the declarant's nervous excitement could subside, (3) the statement involved the startling event, and (4) the declarant observed the startling event. *Smith*, 2019-Ohio-3257, at ¶ 17 (1st Dist.). There is no dispute that Brenda's testimony involved the children's statements about their observing a sufficiently startling event. Thus, the issue for our review is whether the children made these statements to Brenda before M.S.'s and N.S.'s stress or excitement subsided.

**{¶115}** Excited utterances are considered reliable, and therefore admissible, because the declarant lacks a "meaningful opportunity to reflect on statements regarding the event. Without opportunity to reflect, the chance that a statement is fabricated, or distorted due to a poor memory, is greatly reduced." *State v. Wallace*, 37 Ohio St.3d 87, 88 (1988). Excited utterances "must be the product of reactive rather than reflective thinking." *State v. Taylor*, 66 Ohio St.3d 295, 300 (1993). The "central requirement" for such a statement to be admissible is "the statement must be made while the declarant is still under the stress of the event and the statement may not be a result of reflective thought." *Id.* at 303. While the amount of time between the startling event and the statement is relevant, there is "no per se amount of time after which a statement can no longer be considered to be an excited utterance." *Id.*

**{¶116}** Ohio courts commonly determine that when a child makes a statement once the child is safe and away from danger, that statement meets Evid.R. 803(2)'s excited-utterance exception. *State v. Boston*, 46 Ohio St.3d 108, 118 (1989) ("although time had elapsed between the alleged abusive act and [the victim's] statement to her mother, the mother was the first person in whom the victim confided and this occurred at the earliest opportunity."); *see also State v. Duncan*, 53 Ohio St.2d 215, 221 (1978) (child victim's statement to mother around three hours after the assault was admissible because "the mother was the first person the victim confided in, at the earliest opportunity she had to do so."); *State v. Lasecki*, 90 Ohio St. 10, 10 (1914) (four-year-old boy's statement made "ten to thirty seconds after a fatal assault upon his father, made in the boy's presence" was "made at the earliest opportunity to make an outcry in the presence and hearing of others, was the spontaneous and impulsive language of the situation, free from any subterfuge, artifice or motive to fabricate."); *Wallace*, 37 Ohio St.3d at 90-91 (upholding the admission of a five-year-old girl's statement as an excited utterance when she made the statement 15 hours after she was assaulted because the girl was unconscious and when she woke up, she made statements without prompting); *State v. Wagner*, 30 Ohio App.3d 261, 264 (8th Dist. 1986) ("the immediacy of each communication, considered in light of the available opportunities to express himself, satisfies the requirement of spontaneity."); *State v. Smith*, 34 Ohio App.3d 180, 190 (5th Dist. 1986) ("The victim may reasonably believe that she is not safe or secure enough to express any suppressed excited statements until she reaches a safe destination, usually her home. During her trek home, the victim may well be still in the emotional throes of the traumatic event, incapable of reflection and contemplation.").

*3) The children's disclosures were not excited utterances*

**{¶117}** Considering the circumstances surrounding M.S.'s and N.S.'s disclosures to Brenda and the law described above, we hold that M.S.'s and N.S.'s statements were not excited utterances.

**{¶118}** The State argues that when a child is the declarant, courts should liberally apply the excited-utterance exception and permit statements in which longer periods had elapsed between the startling event and the disclosure. But the cases cited by the State to support this argument involve a declarant who is a child-crime victim, not a crime witness. *See State v. Lukacs*, 2010-Ohio-2364 (1st Dist.) (rape); *State v. Muttart*, 2007-Ohio-5267 (rape); *State v. Girts*, 2009-Ohio-3422 (5th Dist.) (rape); *In re D.M.*, 2004-Ohio-5858 (8th Dist.) (gross sexual imposition); *State v. Wallace*, 37 Ohio St.3d 87 (1988) (attempted murder). And in all but one case cited by the State, the declarant was the victim of a sexually-oriented crime. While the Supreme Court of Ohio has recognized a "trend of liberalizing" Evid.R. 803(2)'s exception "when applied to young children who are the victims of sexual assault," *Taylor*, 66 Ohio St.3d at 304, the Court has not extended this principle to nonsexual assault cases or to those who merely witness a crime. Under Evid.R. 102, the "principles of the common law of Ohio shall supplement the provisions of these rules, and the rules shall be construed to state the principles of the common law of Ohio unless the rule clearly indicates that a change is intended." It is the Rules Committee's role to modify the rules of evidence—or where it chooses to do so, the Supreme Court of Ohio's role. As the Supreme Court of Ohio has not extended this trend to statements made by children who are not sexual-abuse victims, we decline to do so.

**{¶119}** M.S.'s and N.S.'s statements to Brenda described Kate physically assaulting their brother, who died later that day. Their declarations do not involve a

sexual assault. Moreover, the children were witnesses to the assault, not the victims. While witnesses to physical assaults may experience "nervous excitement," because the assault was not sexual in nature or perpetrated against M.S. or N.S., their statements fall outside of the scope of the child-sexual-assault-victim exception to the excited utterance temporal limitations.

{¶120} Second, M.S. and N.S. made their statements to their foster parent more than two months after M.S. and N.S. observed the Snyders assault A.S. The juvenile court removed the children from the Snyders' custody the day after A.S.'s death and placed them with Brenda shortly after their removal. Brenda testified that the children referred to her as "Mama B" and told her they loved her, which demonstrates that the children felt safe with her. Unlike in *Boston*, *Wallace*, *Duncan*, *Lasecki*, *Lukacs*, *Wagner*, or *Smith*, M.S.'s and N.S.'s statements were not made in close proximity to the time they were removed from the source of danger.

{¶121} Third, unlike the child declarant in *Girts*, who saw a dog with an erection and told her mom, "My daddy has a pee thing like that" and he "puts it in my mouth," 2009-Ohio-3422, at ¶ 5, M.S.'s and N.S.'s statements were not in response to some event similar to the startling event. Instead, M.S.'s disclosure to Brenda was "out of the blue." While courts have emphasized a child declarant's spontaneity in making the statement as a basis for admitting children's statements, *e.g., In re C.C.*, 2007-Ohio-2226, ¶ 53 (8th Dist.), an excited utterance is reliable because it is made in response to something happening. Excited utterances are not merely spontaneous; rather, they are spontaneously made in response to a startling event. The child's statement in *Girts* was trustworthy because the child made it when she observed something startling and similar to the subject of the excited utterance itself.

{¶122} Finally, we recognize that M.S. and N.S. were under stress and excited

when they made their disclosures to Brenda. But a declarant merely being upset or excited is not enough to justify admissibility under Evid.R. 803(2) because that provides no indication that the declarant's statement did not result from reflective thought. *Taylor*, 66 Ohio St.3d at 303. If that were the only requirement for a child's statement to qualify as an excited utterance, there would be no temporal limitation in the excited-utterance exception as applied to children.

{¶123} More than two months passed between A.S.'s death and the children's statements to Brenda. Both children were outside of the Snyders' control and in a safe place. Nothing startling or similar to the assault happened near the time of the disclosures to rekindle the children's excitement. And the children were neither crime victims nor witnesses to sexual assault. Their statements were not excited utterances and the trial court abused its discretion by admitting Brenda's testimony about the children's disclosures.

### 4) *Harmless-error analysis for improperly-admitted hearsay*

{¶124} Courts have held erroneous admission of hearsay evidence is harmless where the "declarant is examined at trial on the same matters as the hearsay and the erroneous evidence is cumulative in nature." *State v. Nkoyi*, 2024-Ohio-3144, ¶ 21 (12th Dist.); *see State v. Skidmore*, 2010-Ohio-2846, ¶ 26 (7th Dist.) ("improper bolstering testimony where the victim testifies and is subject to cross-examination, the state introduces substantial medical evidence of sexual abuse, and the testimony in question is cumulative to other evidence" can be harmless). Moreover, error may be harmless when "after the tainted evidence is removed, the remaining evidence is overwhelming." *State v. Morris*, 2014-Ohio-5052, ¶ 32.

### 5) *Permitting Brenda's testimony was harmless error*

{¶125} Brenda's testimony about the children's disclosures revealed that M.S.

described events tending to show that Kate slammed A.S.'s head on a hard object. N.S.'s disclosure demonstrated that these events happened the same day that a firetruck came.

{¶126} Neither child's statements to Brenda implicated John. As such, John suffered no prejudice from the trial court's admission of this testimony. Moreover, considering the totality of the circumstances, we hold that the trial court's admission of Brenda's hearsay testimony did not prejudice Kate and was therefore harmless error.

{¶127} First, inexplicably, neither Kate nor John challenge the trial court's permitting Brenda to testify to what Ca.S. said about Kate's involvement in A.S.'s death. While we will not consider whether Brenda's testimony recalling Ca.S.'s statements was improperly admitted, we do consider Ca.S.'s statements in our prejudice analysis. Ca.S.'s statements echoed the key portions of M.S.'s statements to Brenda: Ca.S. was sitting on the couch and told Brenda, "'Mom hit [A.S.]'s head.' Hit head. (Demonstrating.). And she kept shaking. 'Yeah, like that, yeah.' (Demonstrating.)" Brenda's unchallenged testimony about Ca.S.'s statements overlapped M.S.'s statements that Kate forcefully hit A.S.'s head.

{¶128} Second, both declarants—M.S. and N.S.—testified at trial. The State asked both children about what happened the day A.S. died. M.S.'s testimony was largely cumulative of Brenda's hearsay testimony—M.S. said that both John and Kate hit A.S.'s head against the wall in the bathroom on the day he died. When a declarant testifies at trial about the same matters as those contained in the hearsay testimony, that testimony makes it less likely that the hearsay testimony was prejudicial. *Nkoyi*, 2024-Ohio-3144, at ¶ 21 (12th Dist.).

{¶129} Third, the State presented, without objection, M.S.'s entire Mayerson

interview. M.S. indicated in that interview that "mama" hurt A.S. and demonstrated Kate hitting A.S.'s head on the floor. This closely tracked Brenda's testimony that M.S. told her Kate hit A.S.'s head against the floor.

{¶130} Excising Brenda's hearsay testimony, the jury heard three times that Kate, or Kate and John, assaulted A.S.: M.S.'s trial testimony, M.S.'s Mayerson interview, and Ca.S.'s statements to Brenda. M.S.'s trial testimony and Mayerson interview established that the assault occurred on the day A.S. died.

{¶131} Finally, the State presented substantial medical evidence that someone hit A.S.'s head, causing his death. The coroner testified that the fatal hematoma was "acute," meaning it was fresh. Other physicians testified that A.S. did not have the hematoma when he presented at CCHMC the night before his death. And there is no dispute that the Snyders were home with A.S. the day he died.

{¶132} Considering the plethora of properly-admitted evidence that Kate hit A.S.'s head on the day he died, which caused his death, we hold that the erroneous admission of Brenda's testimony did not prejudice Kate and was harmless beyond a reasonable doubt.

### C. *The Nancy and Melissa emails*

{¶133} John and Kate challenge the trial court's admission under Evid.R. 803(3) of an email from Nancy to Melissa and the response emails.

### 1) *Existing state of mind exception*

{¶134} Under Evid.R. 803(3), a hearsay exception exists where, relevant here, the statement involves the declarant's then-existing state of mind or emotion, such as a declarant's plan, intent, pain, or mental feeling. But the rule does not permit admission of statements involving the declarant's "memory or belief to prove the fact remembered or believed," except where the fact involves "the execution, revocation,

identification, or terms of declarant's will." *Id.*

**{¶135}** While trial courts may admit evidence under Evid.R. 803(3) when it involves a declarant's state of mind at the time the declarant made the statement, trial courts cannot admit evidence showing *why* the person held that state of mind. *State v. Apanovitch*, 33 Ohio St.3d 19, 21 (1987). The *Apanovitch* Court explained how a federal court illustrated this rule: "the witnesses were allowed to offer testimony that Cohen said, 'I'm scared,' but not 'I'm scared because Galkin threatened me.'" *Id.* at 21, citing *United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980); *see In re Estate of Beverly*, 2013-Ohio-1498, ¶ 21 (3d Dist.) (admission of decedent's statement that he trusted a person to handle his affairs was admissible, but the trial court should not have admitted a hearsay statement that the decedent trusted the person to handle his affairs because he did not trust another person, who the decedent believed could not handle the task).

**{¶136}** When only a portion of a statement fits within a hearsay exception, the portion that is not covered by the hearsay exception, when offered for the truth of the matter asserted, must be redacted. *See Warner*, 2024-Ohio-1949, at ¶ 32 (1st Dist.); *see also State v. Arnold*, 2010-Ohio-2742, ¶ 41, quoting *Davis v. Washington*, 547 U.S. 813, 829 (2006) ("Through in limine procedure, they should redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence.").

*2) Evid.R. 803(3) need not be future-pointing statements*

**{¶137}** John, citing *State v. Robertson*, 2022-Ohio-905 (5th Dist.), asserts that statements not pointing "toward the future" are inadmissible. We disagree.

**{¶138}** *Robertson* cited *Apanovitch* to support its statement that Evid.R. 803(3) testimony "must point towards the future rather than the past." *Id.* at ¶ 38. But

the *Apanovitch* decision and the cases cited in *Apanovitch* do not stand for the proposition that Evid.R. 803(3) then-existing state-of-mind evidence must be "forward pointing."

**{¶139}** In *Apanovitch*, the State charged Apanovitch with the aggravated murder, aggravated burglary, and rape of Flynn, a woman who had hired Apanovitch to paint her house. At trial, witnesses testified that Flynn feared Apanovitch. As discussed above, the *Apanovitch* court, citing *Cohen*, 631 F.2d at 1225, illustrated what type of hearsay testimony is permitted under Evid.R. 803(3): while witnesses could testify that Flynn felt fearful or anxious—or any other feeling reflecting her then-existing mental or emotional state—the witnesses could not testify about *why* Flynn felt fearful or anxious. The *Apanovitch* Court noted that Evid.R. 803(3) was identical to the federal rule involving state-of-mind testimony and explained,

> Evid. R. 803(3) operates as a vehicle for the admission of a statement such as, "I am afraid of X." ***The critical requirement is that the statement refer to a present and not a past condition***. Where the statement does not relate to a "then existing" condition, it must be viewed as a narrative account formulated after time for reflection, and therefore it is not admissible under Evid. R. 803(3).

(Internal citation omitted. Emphasis added.) *Apanovitch*, 33 Ohio St.3d at 21, fn 1.

**{¶140}** The *Apanovitch* Court added, "Finally, the testimony sought to be introduced must point towards the future rather than the past. When the state of mind is relevant it may be proved by contemporaneous declarations of feeling or intent." *Id.* at 21-22, citing *Shepard v. United States*, 290 U.S. 96 (1933). The Supreme Court of Ohio held that the trial court properly admitted testimony that Flynn was fearful of Apanovitch because it constituted then-existing state-of-mind testimony. *Id.* at 22.

41

**{¶141}** In *Shepard*, the Supreme Court of the United States reviewed Charles Shepard's conviction for murdering his wife, Zenana Shepard. *Shepard* at 97. (This trial occurred long before the Federal Rules of Evidence were enacted.) The government's theory was that Charles was in love with another woman and poisoned Zenana to pursue the other woman. *Id.* at 97-98. A nurse testified that Zenana had told her that the contents of a bottle from which she drank just before she collapsed tasted and smelled strange, asked her if it could be tested for poison, and stated that "Dr. Shepard has poisoned me." *Id.* at 98. The *Shepard* Court reviewed whether Zenana's statements were properly admitted as evidence of her state of mind. *Id.* at 103. The Court determined that the government "did not use the declarations by [Zenana] to prove her present thoughts and feelings, or even her thoughts and feelings in times past. It used the declarations as proof of an act committed by some one else, as evidence that she was dying of poison given by her husband." *Id.* at 104. The Court explained when state of mind is relevant, it

> may be proved by contemporaneous declarations of feeling or intent. Thus, in [probate] proceedings . . ., the [testator's] declarations [may] prove his feelings for his relatives, but are incompetent as evidence of his conduct or of theirs. . . . In [personal-injury actions], declarations by the patient to bystanders or physicians are evidence of sufferings or symptoms, but are not received to prove the acts . . . through which the injuries came about. Even statements of past sufferings or symptoms are generally excluded . . . So also in suits upon insurance policies, declarations by an insured that he intends to go upon a journey with another, may be evidence of a state of mind lending probability to the conclusion that the purpose was fulfilled. . . . Declarations of intention,

casting light upon the future, have been sharply distinguished from declarations of memory, pointing backwards to the past. There would be an end, or nearly that, to the rule against hearsay if the distinction were ignored.

(Internal citations omitted.) *Id*. at 104-106.

**{¶142}** *Apanovitch* and *Shepard* do not suggest that all state-of-mind evidence must be forward pointing. Instead, they hold that evidence of both a declarant's then-existing state of mind and future-pointing statements are admissible.

**{¶143}** As Evid.R. 803(3) permits hearsay evidence that evinces a declarant's then-existing state of mind or a future-pointing plan, but prohibits hearsay testimony describing the reasons for that state of mind and the declarant's statements of memory, we must determine whether the Nancy and Melissa emails were expressions of emotions, feelings, pain, sensations, or mental feelings that existed when they sent them. Evid.R. 803(3).

3) *The email's contents*

**{¶144}** The email and responses between Nancy and Melissa stated,[3]

Something has to be done here. Kate is so badly abusing [A.S.] and [M.S.]. And she screams the most awful things at them that NO ONE should ever say to a child. She totally ruined Mother's Day with what she said to [M.S.], and then Friday to [A.S.]. And I just heard all the screaming again now. I went up for my shot, didn't see [A.S.], but [M.S.] was at the table eating with [Ca.S.] and [N.S.]; Kate was feeding [Co.S.]

---

[3] John challenges the email in its entirety. Kate challenges only the following portion: "something has to be done here. Kate is so badly abusing AS and MS. And she screams the most awful things at them that no one should ever say to a child . . . I can't take this. It's so unfair to these children. And the worst part is, that instead of helping the problem, she is only making it worse . . . she has told them that she wishes they would be dead. It's so horrible . . ." (Ellipses in original.)

a bottle. The older girls were upstairs, and I guess [K.S.] was still asleep. I can't take this . . . It's so unfair to these children. And the worst part is, that instead of helping the problem, she is only making it worse! I'm surprised that the neighbors haven't heard the screaming and called the police. Something has totally unhinged her, and I can't live this way. I can't dare try to comfort [M.S.] and [A.S.]. She has told them that she wishes they would be dead . . . it is so horrible. I just mainly sit down here and cry for them . . . I don't know if they could ever be helped after what she has done to them . . . and all over potty training. If she didn't make such an issue of it, I think the problem would resolve itself. And if it took several months, then put them in pull-ups!

I almost feel the sorriest for [A.S.]. He was so excited to have a father; he loved John. He is really a sweet child - but the accident to his leg was so unfortunate. Kate knew that all of these children had problems, but I guess 5 of them all with issues right now is just too much.

And the worst of it all is that [Adult Child 2] and [Adult Child 1] are screaming at [M.S.] and [A.S.] just as nastily as Kate. I've met their pastor and he seemed to be a very nice man. Something HAS to be done. HELP.

**{¶145}** In a response email, Melissa asked, "Mom, how often is Kate yelling at [M.S.] . . . daily, hourly/ occasionally?" Nancy replied, "Whenever [M.S.] wets the bed or her clothes."

4) *The trial court improperly admitted unredacted emails*

**{¶146}** Most of the statements contained in the Nancy and Melissa emails do not reflect the declarants' state of mind. Instead, they reflect the reasons explaining

44

the declarants' states of mind. For example, the second sentence in the email—"Kate is so badly abusing [A.S.] and [M.S.]."—does not describe Nancy's state of mind. Instead, it explains why Nancy believes "Something has to be done" and why she "can't take this."

**{¶147}** The statements in the Nancy and Melissa emails that reflect the declarant's state of mind are (1) "Something has to be done here," (2) "I can't take this," (3) "It's so unfair," (4) "I'm surprised," (5) "I can't live this way," (6) "I almost feel the sorriest for [A.S.]," and (7) "Something HAS to be done. HELP." These statements tell the listener only Nancy's state of mind when she made the statements.

**{¶148}** The remainder of the statements contained in these emails were improperly admitted. Many statements explain the basis for Nancy's state of mind and are therefore inadmissible under *Apanovitch*, 33 Ohio St.3d at 21. Some statements specifically report events from Nancy's memory to prove a fact, which Evid.R. 803(3) explicitly prohibits. Therefore, the trial court abused its discretion by admitting the unredacted email communication.

*5) Harmless-error analysis*

**{¶149}** Next, we consider whether the trial court's error in admitting the Nancy and Melissa emails without redaction was harmless. The Snyders point out that the jury heard the emails' entire contents during Wilcher's testimony and the State's closing argument. The State referred to the Nancy and Melissa emails four times during closing arguments.

**{¶150}** The emails directly contradicted some defense witnesses' testimony, including Adult Child 1 and Adult Child 2, who testified that the Snyders were loving people and never yelled at their children. The email also corroborated N.S.'s testimony that the Snyders yelled at "everybody." And the emails suggested that John and Kate

yelled at the children when they had bathroom accidents.

{¶151}But ultimately, the improper admission was harmless error. First, the State relied on the emails in its closing to establish that the Snyders acted with prior calculation and design, an element of one of the Snyders' aggravated-murder charges. The jury acquitted the Snyders on those charges.

{¶152} Second, the context of the emails shows that the "abuse" to which Nancy referred consisted of the Snyders saying awful things to the children and screaming at them. And while the email portrayed the Snyders as parents who were prone to screaming at their children, the emails did not establish any element of any of the charges for which the Snyders were convicted.

{¶153} Third, the jury's verdicts were mixed—it found the Snyders guilty on some charges and not guilty on others. Indeed, it found the Snyders guilty of one murder count and not guilty of the others. Likewise, the jury found the Snyders not guilty of some child-endangerment charges, but guilty of others. This demonstrates that the jury carefully considered the elements of each offense and whether the evidence established those elements.

{¶154} Finally, both M.S. and N.S. testified at trial that the Snyders disciplined the children when any of them had a bathroom accident. Indeed, the children testified that the discipline went much further than screaming—they testified that the Snyders physically punished the children by making them take cold showers, withholding food, and hitting them.

{¶155} Admitting the unredacted Nancy and Melissa emails was an abuse of discretion, but its admission was harmless error.

### D. *We presume jurors follow trial courts' instructions*

{¶156} Next, Kate asserts that the trial court erred by allowing a caseworker to

testify about statements the children made to her when she was driving them to their foster home.

**{¶157}** Melissa From, a caseworker with the Hamilton County Department of Job and Family Services, testified that she was assigned case responsibility for the Snyder children in October 2016. After A.S.'s death, From drove M.S., Ca.S., and N.S. to a foster home several hours away. From explained that during the drive, M.S. slammed a doll against the roof of the car while saying, "Momma, momma." The Snyders objected to this testimony and the trial court overruled the objection. The caseworker went on to testify that she was present at M.S.'s Mayerson interview and observed M.S. slam a doll's head on a table.

**{¶158}** After this testimony, the trial court reconsidered its ruling and struck From's testimony recalling that M.S. had slammed a doll against the car's roof while saying "Momma." The trial court instructed the jury to disregard From's testimony "as to what she witnessed [M.S.] do in the car with the doll."

**{¶159}** Kate argues on appeal that "the proverbial 'bell could not be unrung.'" Kate does not develop this argument further.

**{¶160}** In certain circumstances, "'an inadmissible statement is of such impact that a curative instruction is ineffective and reversal is required.'" *State v. Price*, 2025-Ohio-2218 (8th Dist.), quoting *State v. Walton*, 1978 Ohio App. LEXIS 10180, *14 (8th Dist. Aug. 10, 1978). But generally, "'[w]here the trial court has sustained an objection and provided a curative instruction to the jury, we must presume the jury followed the trial court's instruction.'" *State v. Walker-Curry*, 2019-Ohio-147, ¶ 35 (8th Dist.), quoting *State v. Sailor*, 2004-Ohio-5207, ¶ 34 (8th Dist.).

**{¶161}** From's testimony was not so prejudicial that the trial court's curative instruction failed to sufficiently cure the error. Moreover, From's testimony was

duplicative of other evidence demonstrating that Kate hit A.S.'s head on a hard object.

{¶162} In sum, we hold that the trial court's admission of Brenda's hearsay testimony and the unredacted Nancy and Melissa emails were abuses of discretion, but both errors were harmless. The trial court struck From's testimony and issued a curative instruction, causing us to presume the jury followed the instruction to disregard that testimony. We overrule Kate's first assignment of error and John's second and third assignments of error.

## II.    **Admission of Mayerson interviews**

{¶163} Kate's second assignment of error asserts that the trial court erred by admitting M.S.'s Mayerson interview.

{¶164} This court has held that it was not plain error for a trial court to admit forensic interviews of children as statements made for medical diagnosis and treatment under Evid.R. 803(4). *Warner*, 2024-Ohio-1949, at ¶ 32 (1st Dist.). But defendants may challenge a trial court's admission of specific statements in a forensic interview as not constituting statements made for medical diagnosis and treatment. *Id.* at ¶ 32. When an appellant fails to challenge specific statements, this court need not parse through the interviews to determine which statements were properly admitted. *State v. Sims*, 2023-Ohio-1179, ¶ 82 (4th Dist.).

{¶165} Kate generally attacks the admission of the interviews as not being made for purposes of medical diagnosis or treatment. The only portion of the interview Kate specifically challenges involves Hicks handing M.S. a doll, identifying the doll as A.S., "and letting MS bang it and say momma." Kate argues that statements M.S. made in the interview about A.S. "were not for her own medical treatment."

{¶166} First, there can be little doubt that a child who witnesses her parents assaulting her sibling, who then dies as a result of the assault, experiences trauma,

48

even though the assault was not against the child herself. And Evid.R. 803(4)'s term "medical diagnosis or treatment" does not solely involve physical health—it includes mental-health diagnoses and treatment. *See, e.g.*, *State v. O.E.P.-T.*, 2023-Ohio-2035, ¶ 170 (10th Dist.); *State v. Mack*, 2023-Ohio-4374, ¶ 27 (11th Dist.); *State v. Jordan*, 2022-Ohio-2708, ¶ 33 (2d Dist.).

**{¶167}** Moreover, the Snyders specifically stated on the record that they did not object to the Mayerson interviews. Instead, they used the Mayerson interviews to impeach M.S. and N.S. If there was any error in the trial court's admission of the Mayerson interviews, Kate invited that error. *See, e.g., State v. Davis*, 2008-Ohio-2, ¶ 86, quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20 (1986), paragraph one of the syllabus (Because the defendant agreed to admit recordings of a police interview without objection, he invited any error and could not "take advantage of an error which he himself invited or induced.").

**{¶168}** We overrule Kate's second assignment of error.

III.     **Admission of pediatric-child-abuse expert's testimony**

**{¶169}** In her third assignment of error, Kate argues that the trial court abused its discretion by allowing Dr. Makoroff to testify as an expert involving whether A.S. had brittle-bone disease and whether there was a correlation between the bruising on A.S.'s forehead and the location of the fatal subdural hematoma.

**{¶170}** Evid.R. 702 permits a witness to testify as an expert when

(1) the witness is qualified by specialized knowledge, skill, experience, training, or education regarding the subject matter; (2) the testimony either relates to matters beyond the knowledge or experience possessed by laypersons or dispels a misconception common among laypersons; and (3) the testimony is based upon scientific, technical, or other

specialized information.

*State v. Garrett*, 2010-Ohio-5431, ¶ 35 (1st Dist.).

**{¶171}** We review the trial court's determination that a witness is qualified to provide expert testimony for an abuse of discretion. *Id.*

**{¶172}** The trial court qualified Dr. Makoroff as a pediatric-abuse expert. The State asked Dr. Makoroff if A.S.'s radiology records suggested that A.S. might have brittle-bone disease. The Snyders objected, arguing that Dr. Makoroff was not an expert in either radiology or brittle-bone disease. The trial court overruled that objection, noting Dr. Makoroff's status as a board-certified doctor in pediatrics and as an attending physician at CCHMC. Dr. Makoroff answered the State's question, "I don't know . . . I can't make that determination on [A.S.]."

**{¶173}** Additionally, the State asked Dr. Makoroff if there was "any correlation to the bruising on [A.S.'s] forehead and the subdural [hematoma] on the left side of his head." Dr. Makoroff answered, "[N]o, I cannot say that there's a correlation between those two." She explained that for children who "can move around even a little bit," bruising on a child's forehead is "pretty nonspecific." Moreover, she acknowledged that A.S. banged his head, but testified that she was not aware of any reported case in which headbanging caused a child's death or a large subdural hematoma like A.S.'s.

**{¶174}** The trial court did not abuse its discretion. First, Dr. Makoroff testified that she did not know if A.S. had brittle-bone disease, so even if that testimony were outside of Dr. Makoroff's area of expertise, there is no prejudice to the defense.

**{¶175}** Second, Dr. Makoroff's testimony involving the lack of correlation between A.S.'s forehead bruises and the fatal subdural hematoma was not outside of her area of expertise. The trial court qualified her as a pediatric-child-abuse specialist.

In that role, Dr. Makoroff, a CCHMC pediatrician, consults on suspected child-abuse cases, reviews the medical records, including x-rays, CT scans, and laboratory results, and consults with other specialists before developing a diagnosis. Given this information, the trial court did not act arbitrarily, unreasonably, or unconscionably in determining that Dr. Makoroff was qualified to give an opinion involving the lack of a correlation between A.S.'s forehead bruise and the large subdural hematoma that caused his death.

{¶176} We overrule Kate's third assignment of error.

### IV. Ineffective assistance of counsel

{¶177} Kate's fourth assignment of error asserts that she received ineffective assistance of counsel based on her trial counsel's failure to (1) obtain an expert to testify about the force and physics required to cause a hematoma like A.S.'s, (2) object to the admission of M.S.'s forensic interview, and (3) cross-examine the State's witnesses on "when and how aspiration occurred, to provide a credible alternative theory as to the cause of A.S.'s death."

{¶178} John's first issue under his eleventh assignment of error argues that his trial counsel was ineffective for failing to cross-examine the State's witnesses regarding the possibility that A.S.'s pneumonia originated from his aspirating contaminated bath water.

#### A. *Material outside the record cannot establish ineffective assistance of counsel on direct appeal*

{¶179} Kate's first and third bases for her ineffective-assistance claim, and John's first basis for his ineffective-assistance claim, fail because these arguments depend upon material outside the record, which this court cannot consider on direct appeal.

{¶180} Kate first argues that trial counsel should have obtained a bioengineering expert to explain that A.S. could have caused the fatal subdural hematoma by headbanging. Kate asserts that this expert would have opposed the State's experts' testimony that A.S. would have lacked the strength to do so.

{¶181} Second, Kate cites the portion of Wilcher's testimony where Kate told him that the day before A.S. died, after A.S. had a bowel movement in the bathtub, Kate left the bathroom "for approximately ten seconds" to get soap. When she returned, A.S. had turned the water on, stopped the drain, "and had his face down in what she described as a very minimal amount of water." Kate asserts that an expert could have shown that aspirating feces caused the bacteria in A.S.'s lungs that led to his pneumonia. Likewise, John argues that Wilcher's testimony that A.S. was in a bathtub with feces "provided a possible source of A.S.'s massive lung infection that went unnoticed by both parties," and his counsel was ineffective for failing to recognize this testimony's significance, cross-examine the State's witnesses about this possibility, or bolster his own experts' testimony that A.S. had pneumonia when he visited CCHMC the day before his death.

{¶182} These arguments fail in a direct appeal because we can only speculate about what hypothetical witnesses might testify involving potential injuries caused by A.S.'s headbanging, whether A.S. aspirated feces in the bathtub, or the effects thereof. As such, it is impossible to know whether the Snyders were prejudiced. *See Collins*, 2024-Ohio-5112, at ¶ 73 (1st Dist.), quoting *State v. Blanton*, 2022-Ohio-3985, ¶ 41 (claims that depend "upon evidence outside the trial record are better suited for proceedings where that evidence can be introduced, such as a petition for postconviction relief under R.C. 2953.21 or a motion for a new trial under Crim.R. 33.").

**B. *The Snyders' trial strategy included not objecting to the Mayerson interviews***

**{¶183}** Kate also asserts that her trial counsel was ineffective by failing to object to the trial court's admission of M.S.'s Mayerson interview.

**{¶184}** Kate's trial attorneys affirmatively stated on the record that they did not object to the admission of both M.S.'s and N.S.'s forensic interviews. And while Kate's trial attorney could have objected to some of M.S.'s statements, her counsel's decision to use the children's Mayerson interviews to impeach M.S. and N.S., as well as several other State's witnesses, clearly was a strategic decision. The Snyders called an expert witness to attack Hicks's forensic interview of M.S and N.S. to show that Hicks improperly elicited tainted statements from M.S. and N.S., which tainted their future testimony.

**{¶185}** Even if we could find counsel's trial strategy questionable, that would not be enough to find trial counsel ineffective. "Questionable trial strategies and tactics . . . do not rise to the level of ineffective assistance of counsel." *State v. Mohamed*, 2017-Ohio-7468, ¶ 18. Moreover, N.S.'s Mayerson interview may have helped the Snyders, given that N.S. made no disclosures of abuse and stated that A.S. hurt himself.

**{¶186}** We overrule Kate's fourth assignment of error and the portion of John's eleventh assignment of error under his first issue for review.

## V.   <u>Preindictment delay did not violate Kate's rights</u>

**{¶187}** In her fifth assignment of error, Kate asserts that her due-process rights were violated by the State's preindictment delay. A.S. died on October 5, 2016. The State indicted the Snyders in September 2022, nearly six years later.

A. *Unjustifiable preindictment delays violate defendants' rights*

**{¶188}** On its face, the Sixth Amendment to the United States Constitution, which guarantees a defendant's right to a speedy trial, does not protect those who have not formally been accused of a crime. *State v. Jones*, 2016-Ohio-5105, ¶ 11. But a preindictment delay violates a defendant's due-process rights if an unjustifiable delay "causes actual prejudice." *Id.* at ¶ 12. Ohio courts use a burden-shifting framework in preindictment-delay cases. *Id.* at ¶ 13. The defendant has the initial burden of presenting evidence establishing that the preindictment delay caused actual prejudice. *State v. Bourn*, 2022-Ohio-4321, ¶ 11. If the defendant meets that burden, the burden shifts to the State to "produce evidence of a justifiable reason for the delay." *Id.*

**{¶189}** Determining if a defendant has established actual prejudice involves a "delicate judgment" and consideration of the facts of the particular case. *Id.* at ¶ 12, quoting *Jones* at ¶ 20. If a defendant can prove the "unavailability of specific evidence or testimony that would attack the credibility or weight of the state's evidence against a defendant and thereby aid in establishing a defense[, this] may satisfy the due-process requirement of actual prejudice." *Jones* at ¶ 25. Actual prejudice exists when the defendant identifies relevant missing evidence or unavailable testimony that would have bolstered the defense and minimized the impact of the State's evidence. *Jones* at ¶ 28.

**{¶190}** It is not enough to show that missing evidence or unavailable testimony *could* or *may* have helped the defendant; rather, the burden requires a showing that the evidence "*would* help the defendant." (Emphasis in original.) *Bourn* at ¶ 17. The *Bourn* Court noted, "One might argue that this is a high standard for defendants, but the standard is commensurate with the defendant's burden in these cases. Indeed, as this court noted in *Adams*, '[t]he burden upon a defendant seeking to prove that

54

preindictment delay violated due process is nearly "'insurmountable.'"" *Id.* at ¶ 18, quoting *State v. Adams*, 2015-Ohio-3954, ¶ 100, quoting *United States v. Montgomery*, 491 Fed.Appx. 683, 691 (6th Cir. 2012), quoting *United States v. Rogers*, 118 F.3d 466, 477, fn. 10 (6th Cir. 1997).

## B. *Kate has not shown prejudice*

{¶191} Kate argues that she has shown actual prejudice because (1) her medical investigators lost the opportunity to investigate the case closer in time to A.S.'s death, and (2) police interview notes were lost following a server crash in 2018.

{¶192} Kate's first basis for prejudice is speculative, so she cannot sustain her burden to show actual prejudice. While an earlier indictment, in theory, *may* have led to different medical information about A.S., Kate does not suggest what that information would have been. Indeed, she argues that the conflicting medical opinions at trial "*perhaps* could have been reconciled with a closer in time examination of the medical records." Because she cannot show that a lack of preindictment delay "would" have helped her, she cannot show prejudice based on a theoretical closer-in-time medical investigation.

{¶193} Turning to the missing police notes, Uhl and Wilcher both testified that sometime in 2018, a server used by several Hamilton County law-enforcement agencies crashed. The crash caused the Springfield Township Police Department to lose investigative notes involving A.S.'s death, including Uhl's notes from his visit to the Snyders' home and Wilcher's notes from the interviews he conducted.

{¶194} Wilcher stated that the "majority" of the interviews he conducted were video recorded and those recordings were not lost in the server crash. The "major [interviews] were preserved that way." The interview notes that were lost, on the other hand, were "minor interviews, such as neighbors" that consisted of only "a few brief

sentences."

{¶195} While there is no dispute that evidence was lost, Kate has not established that she suffered actual prejudice as a result. The majority of Wilcher's interviews were recorded and still exist. Those missing were "minor" interviews of neighbors and consisted of only a few sentences. And to the extent that any of these neighbors could provide exculpatory information, nothing in the record demonstrates that the Snyders or their investigators were prevented from seeking out the neighbors. There is no evidence that any of the Snyders' former neighbors became unavailable due to the delay. And even "the death of a potential witness will not always constitute actual prejudice." *Jones*, 2016-Ohio-5105, at ¶ 26.

{¶196} Kate failed to establish actual prejudice and we overrule her fifth assignment of error.

## VI.   <u>Sufficiency of the evidence</u>

{¶197} In Kate's sixth assignment of error, and in John's eighth assignment of error, the Snyders assert that the evidence was insufficient to support their convictions.

{¶198} Initially, we note that John and Kate challenge their convictions for feloniously assaulting A.S. on October 5, 2016, charged in Counts 5 and 16. But because those offenses were merged at sentencing with the felony-murder charges in Counts 4 and 15, the trial court did not impose sentences for Counts 5 and 16. Because the trial court did not impose sentences for the October 5, 2016 felonious-assault counts, the Snyders were not convicted of those offenses. *State v. Turner*, 2025-Ohio-386, ¶ 26 (1st Dist.). But because the Snyders' murder convictions under R.C. 2903.02(B) are based on their "committing or attempting to commit an offense of violence that is a felony of the first or second degree," we analyze whether sufficient

evidence would support convicting the Snyders for feloniously assaulting A.S. on October 5, 2016.

**{¶199}** John asserts that the State "failed to offer any evidence it was John who landed the blow that caused, or that he was otherwise complicit in, A.S.'s death." He also asserts that the State failed to offer evidence showing that he feloniously assaulted A.S. at any point or that any of his conduct caused any of the children serious physical harm, an element of felonious child endangerment. Kate argues that the State failed to show that she put her children "in harm's way," mainly pointing to conflicting evidence. We save our analysis of conflicting evidence for our manifest-weight review.

### A. *Sufficiency standard*

**{¶200}** When reviewing a conviction under a sufficiency-of-the-evidence standard, we view the evidence in the light most favorable to the State and ask whether reasonable factfinders could have found that the State proved, beyond a reasonable doubt, every element of the offense. *State v. Henderson*, 2024-Ohio-2312, ¶ 24 (1st Dist.). This court considers all evidence admitted at trial, regardless of whether that evidence was erroneously admitted. *State v. Justice*, 2024-Ohio-2574, ¶ 24 (1st Dist.).

### B. *Felony Murder and Felonious Assault*

**{¶201}** The jury found both Snyders guilty of felony murder in violation of R.C. 2903.02(B), which provides, "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree . . . ." By definition, a felony-murder conviction requires the State to prove that the defendant committed the underlying felony. *Id.*; *State v. Liberatore*, 4 Ohio St.3d 13, 15 (1983). The Snyders' felony-murder convictions were premised on their felonious assault of A.S. on October 5, 2016, which was the conduct charged in Count 5 (John) and Count 16 (Kate).

R.C. 2903.11(A)(1) provides, "No person shall knowingly . . . [c]ause serious physical harm to another." A person acts knowingly, "regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Relevant to these counts, serious physical harm means "[a]ny physical harm that carries a substantial risk of death." R.C. 2901.01(5)(b).

**{¶202}** The Snyders' felony-murder convictions were supported by sufficient evidence. At trial, M.S. testified that on the day A.S. died, she witnessed both Snyders hit A.S.'s head against a wall. There was no dispute that both Snyders were home the day of A.S.'s death.

**{¶203}** Specific to Kate, M.S. stated in her Mayerson interview that "Mama" hurt A.S. and demonstrated this by hitting a doll representing A.S. against a table. Brenda testified that M.S., N.S., and Ca.S. collectively disclosed that Kate struck A.S.'s head the day he died.

**{¶204}** Viewing the evidence in the light most favorable to the State, the evidence was sufficient to establish that the Snyders feloniously assaulted A.S. on October 5, 2016.

**{¶205}** And the State presented sufficient evidence to establish that this felonious assault proximately caused A.S.'s death. Dr. Stephens performed A.S.'s autopsy. She testified that A.S. died due to an acute nonaccidental subdural hematoma. She identified a bruise on the lower-back-right side of A.S.'s head as the location of the blow that caused the hematoma. Dr. Stephens explained that the bruise's location was inconsistent with self-injury caused by a person engaged in headbanging. And she testified that generally, when a person loses consciousness, they lose the ability to cough or swallow, which allows foreign objects (like saliva or the

stomach's contents) to be inhaled into the lungs as long as the person continues breathing. Accordingly, Dr. Stephens believed that the pneumonia found in A.S.'s lungs did not predate the hematoma.

**{¶206}** Dr. Reidy was a pediatrician who examined A.S. on October 4, the evening before he died. He testified that based on A.S.'s vital signs that evening, A.S. showed no signs of infection, including pneumonia, and no signs of a head injury.

**{¶207}** Dr. Staat also reviewed A.S.'s vital signs from his October 4 hospital records. She testified that those records did not indicate that A.S. had an infection.

**{¶208}** M.S.'s testimony, viewed in the light most favorable to the State, established that both Kate and John struck A.S.'s head against a hard object on October 5, 2016. And, again viewing the evidence in favor of the State, expert witnesses demonstrated that A.S.'s death was caused by a blow to the head and that the fatal injury occurred after A.S. left the hospital the day before his death. This evidence was sufficient to permit a reasonable factfinder to conclude that A.S. died from a subdural hematoma caused by the Snyders hitting the back of A.S.'s head on the day he died.

**{¶209}** The Snyders' felony-murder convictions were supported by sufficient evidence showing that the Snyders feloniously assaulted A.S., which caused his death.

### C. *Felonious assault from September 2016 until A.S.'s death*

**{¶210}** The trial court convicted the Snyders of feloniously assaulting A.S. between September 1, 2016, and October 5, 2016, in violation of R.C. 2903.11(A)(1). This count involves the Snyders' "failure to ensure the child received proper nutrition and proper medical care."

**{¶211}** As discussed above, R.C. 2903.11(A)(1) prohibits any person from knowingly causing "serious physical harm to another." Serious physical harm, relevant to this charge, is any physical harm involving either "acute pain" resulting in

"substantial suffering" or "any degree of prolonged or intractable pain." R.C. 2901.01(5)(e).

**{¶212}** As the statute does not define "pain," we look to its common, ordinary meaning. *State v. White*, 29 Ohio St.3d 39, 40 (1987). Merriam-Webster's Dictionary defines pain as "a localized or generalized unpleasant bodily sensation or complex of sensations that causes mild to severe physical discomfort." *Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/pain?src=search-dict-box (accessed Sept. 2, 2025) [https://perma.cc/8N9W-AZVP]. Determining the degree of harm that constitutes "serious physical harm is not an exact science." *State v. Fitzgerald*, 2017-Ohio-2717, ¶ 23 (12th Dist.).

### 1) *Evidence of malnourishment supports a felonious-assault conviction*

**{¶213}** Parents' knowing failure to meet their legal duty to care for their children may constitute felonious assault where that knowing failure to act results in serious physical harm. *State v. Elliott*, 104 Ohio App.3d 812, 817-818 (10th Dist. 1995). The sensations associated with starvation—"the hunger pains and emptiness felt while slowly starving"—easily constitute "pain" under the dictionary definition. *See Fitzgerald* at ¶ 24. And R.C. 2901.01(A)(5)(e)'s definition of "serious physical harm" expressly includes "any degree of prolonged" pain.

**{¶214}** As such, evidence that a defendant caused someone to lose a significant amount of weight over a short period of time or experience starvation sufficiently demonstrates serious physical harm. *See State v. Louis*, 2016-Ohio-7596, ¶ 58 (4th Dist.) ("The children were severely malnourished, weighing less in 2014 than they did in 2012."); *State v. Murphy*, 2025-Ohio-63, ¶ 35 (12th Dist.) (a defendant's act of starving dogs to the point that several died constituted serious physical harm); *State v. Johnson-Millender*, 2005-Ohio-4407, ¶ 46 (5th Dist.) (a defendant's making "a

conscious decision to withhold food from her son for a period of twenty-seven days," resulting in the child's death, constituted abuse under R.C. 2919.22(B)); *State v. Thompson*, 2017-Ohio-9044, ¶ 18 (7th Dist.) (a treating physician diagnosed children with food deprivation, noting that the three children appeared malnourished because they had lost significant weight in five months, which was sufficient evidence of serious physical harm); *State v. Rockwell*, 80 Ohio App.3d 157, 172 (10th Dist. 1992) (evidence that a child had lost weight and was underweight for her age indicated that she had not been fed properly over a significant period of time and, combined with evidence of bruises on the child's face, supported the court's finding serious physical harm); *State v. Miku*, 2018-Ohio-1584, ¶ 31 (5th Dist.) (upholding a conviction under R.C. 2919.22(B)(2) where, in a five-month period, a young child had lost more than one pound, a witness testified the child was always hungry, and the child died from physical trauma inflicted by defendant); *compare State v. Cunningham*, 2021-Ohio-416, ¶ 45 (reversing a conviction under R.C. 2919.22(B)(2) in part because "none of the evidence suggests that the child suffered starvation or malnourishment.").

2) *Sufficient evidence supported the Snyders' felonious-assault convictions*

{¶215} John argues that the State provided no evidence he committed an assault on A.S. separate from the assault supporting the felony-murder conviction.

{¶216} But the evidence showed A.S. had lost five-and-a-half pounds from the time he arrived in the United States in late February 2016 until his death in October 2016. Dr. Reidy testified that A.S. had lost a pound between the end of August and October 4. A nurse who saw A.S. on October 4 testified Kate told her that A.S. had not eaten in "a couple of days." The coroner's report noted that A.S.'s fatty tissue was pale and minimal, which would be expected in a person who is malnourished. Dr. Stephens

noted that A.S.'s adrenal glands were small and "their cortices . . . were very thin . . . and only minimal yellow color to show for lipid was present . . . This usually occurs in someone that is chronically ill. So long-term illness, long term stress from illness."

**{¶217}** The Snyders presented evidence that A.S. refused to eat and they were attempting to feed him. But when reviewing a conviction for sufficiency, we consider the evidence in the light most favorable to the State. A trier of fact could infer that the Snyders knowingly failed to feed A.S., resulting in A.S.'s malnutrition and starvation.

**{¶218}** Moreover, A.S. had severe bedsores. Experts testified that these bedsores would not have developed overnight and instead would take days or weeks to develop. Further, deep bedsores can lead to infection and death. Additionally, Dr. Sorensen testified that Kate told her the Snyders taped A.S.'s hands to his pants and that A.S.'s bedsores could have been caused by his being unable to move for long periods of time due to his taped hands. The Snyders did not procure medical care for A.S.'s bedsores.

**{¶219}** Sufficient evidence supports the Snyders' felonious-assault convictions from September 1, 2016, to October 5, 2016.

### D. *Child-endangerment: duty of care violation*

**{¶220}** The Snyders were convicted of violating R.C. 2919.22(A) for endangering K.S., M.S., and Co.S.

#### 1) *Child endangerment: Duty of care*

**{¶221}** R.C. 2919.22(A) provides that no person "who is the parent . . . of a child under eighteen years of age . . . shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." Unlike R.C. 2919.22(B), which prohibits a person from endangering children due to that person's *acts*, R.C. 2919.22(A) prohibits parents from creating a substantial risk to their

children through their *omissions*. Thus, R.C. 2919.22(A) imposes criminal liability on parents who create a substantial risk to their children by failing to care for, protect, or support their children—in other words, the statute punishes neglect. *State v. Abrams*, 2024-Ohio-2666, ¶ 13 (12th Dist.).

{¶222} A "substantial risk" is "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). To secure a conviction under R.C. 2919.22(A), the State must prove that the parent acted recklessly. *State v. McGee*, 79 Ohio St.3d 193, 195 (1997). "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). A violation of R.C. 2919.22(A) is a third-degree felony if it results in serious physical harm to the child. R.C. 2919.22(E)(2)(c).

{¶223} As discussed above, R.C. 2901.01(A)(5)(e)'s definition of "serious physical harm" expressly includes "any degree of prolonged" pain and the pains associated with hunger and starvation constitute "pain." *Fitzgerald*, 2017-Ohio-2717, at ¶ 24 (12th Dist.). Moreover, evidence that a person caused another person to experience starvation demonstrates serious physical pain. *See Louis*, 2016-Ohio-7596, at ¶ 58 (4th Dist.); *Murphy*, 2025-Ohio-63, at ¶ 35 (12th Dist.); *Johnson-Millender*, 2005-Ohio-4407, at ¶ 46 (5th Dist.); *Thompson*, 2017-Ohio-9044, at ¶ 18 (7th Dist.); *Rockwell*, 80 Ohio App.3d at 172; *Miku*, 2018-Ohio-1584, at ¶ 31 (5th Dist.).

2) *Counts 7 and 18: K.S.*

{¶224} Kate combined her sufficiency and manifest-weight arguments. Other than A.S., Kate did not present arguments specific to each child and did not directly address the child-endangerment counts. Instead, relevant to K.S., M.S., and Co.S., she

argues generally that because her adult children and some friends testified that Kate created a good homelife and did not withhold food, the evidence was insufficient to convict her of any of the charges.

**{¶225}** John argues that "[t]he sole basis" showing that the Snyders failed to provide K.S., M.S., and Co.S. adequate nutrition was that they gained weight after being removed from the Snyders' care. But the State presented evidence showing that K.S. gained barely any weight over a seven-year period and would have experienced pain associated with hunger.

**{¶226}** K.S. could not independently move or eat—she relied on others to spoon feed her pureed food or provide nutrition via a tube. The State admitted into evidence a letter from Dr. Makoroff in which she provided an expert opinion diagnosing K.S. with nutritional neglect and opining that she would have experienced pain from hunger. Dr. Makoroff also testified about K.S. at trial.

**{¶227}** K.S.'s medical records reveal that during the seven-year period between October 2009 and October 2016, K.S. gained only 4.4 pounds. But Dr. Makoroff testified that, after K.S.'s removal from her parents' home, she "demonstrated that she could gain over 4 kg [8.8 pounds]" in approximately 2.5 months "and maintain that weight."

**{¶228}** Dr. Makoroff explained that, due to K.S.'s various medical conditions, her weight should have been lower than other children her age. But Dr. Makoroff said K.S. should have gained more weight over that seven-year period. Moreover, based on K.S.'s ability to gain weight after she was removed from the Snyders' care, Dr. Makoroff testified that nothing medically precluded K.S. from gaining weight while in her parents' care. Dr. Makoroff opined that K.S.'s lack of weight gain risked infection and a lack of developmental gains. Further, according to Dr. Makoroff, K.S. would have

experienced pains associated with hunger.

**{¶229}** Construing the evidence in the State's favor, we hold that the evidence was sufficient to support John's and Kate's convictions for child endangerment involving K.S., charged in Counts 7 (John) and 18 (Kate). The Snyders' omissions—their failure to care for and provide sufficient nutrition to K.S.—caused a substantial risk to K.S.'s health and safety. And Dr. Makoroff explained that K.S. would have experienced hunger pains associated with starvation, which constitutes serious physical harm.

### 3) *Counts 8 and 19: M.S.*

**{¶230}** To support the Snyders' R.C. 2919.22(A) convictions related to M.S., the State cites Kate's refusal to provide M.S. with a comprehensive developmental evaluation, speech therapy, or a cochlear implant. It also points to M.S.'s testimony that (1) M.S. was "forced to sleep on the floor, and then in a blow-up floating device," (2) the Snyders punished M.S. after bathroom accidents by withholding food, isolating M.S., and making her take cold showers, and (3) the Snyders hit M.S.

**{¶231}** This evidence was insufficient to support the Snyders' convictions under Counts 8 and 19, which alleged that the Snyders' failure to care for and protect M.S. created a substantial risk to M.S.'s health and safety. "Affirmative acts of torture, abuse, and excessive acts of corporal punishment or disciplinary measures are expressly covered under [R.C. 2919.22(B)]." *State v. Kamel*, 12 Ohio St.3d 306, 308-309 (1984). R.C. 2919.22(A) involves parents' neglect of a child. *Id.* at 309. "Manifestly, such neglect is characterized by acts of omission rather than acts of commission." *Id.*

**{¶232}** Other than the Snyders' failure to provide M.S. certain medical services, each piece of evidence on which the State relies to support the convictions under

Counts 8 and 19 is an affirmative act. Hitting M.S., placing her in cold showers *as punishment*, isolating her *as punishment*, and withholding food *as punishment* are all affirmative acts of "physical cruelty or . . . improper discipline or restraint." *See* 1974 Committee Comment to R.C. 2919.22(B); *see also Johnson-Millender*, 2005-Ohio-4407, at ¶ 46 (5th Dist.) (defendant's "conscious decision to withhold food from her son for a period of twenty-seven days" was abuse under R.C. 2919.22(B)).

**{¶233}** The State asserts that because the Snyders did not secure for M.S. a developmental assessment, speech therapy, or a cochlear implant, their conduct constituted endangerment under R.C. 2919.22(A). But the State does not explain how the Snyders' refusal to provide those services created a substantial risk to M.S.'s health or safety.

**{¶234}** The State cites the Snyders keeping "all the children on a very restricted diet," despite the children not having the food allergies they claimed. But feeding a child a gluten-free diet despite the child not having celiac disease is, at most, odd. There is no evidence that the Snyders' restricting the children's diets to gluten-free or dairy-free food caused the children any harm.

**{¶235}** Finally, evidence that the Snyders made M.S. sleep on an inflatable pool float appears to show an affirmative act of discipline. And there was no testimony, expert or otherwise, showing that where M.S. slept created a substantial risk to her health or safety.

**{¶236}** A conviction based on insufficient evidence violates a defendant's due process rights and the State is precluded from retrying the defendant. *See Henderson*, 2024-Ohio-2312, at ¶ 33 (1st Dist.). We reverse John's and Kate's child-endangerment convictions under Counts 8 (John) and 19 (Kate), and we discharge them from further prosecution on those counts.

*4) Count 21: Co.S.*

**{¶237}** The trial court convicted John (Count 10) and Kate (Count 21) of child endangerment under R.C. 2919.22(A) involving Co.S., the Snyders' youngest child. Co.S. was less than a year old when the Snyders adopted him. Co.S. had biliary atresia, a congenital condition causing his liver to form improperly. Dr. Staat testified that this condition would "nearly always . . . lead to the child . . . needing a liver transplant."

**{¶238}** Co.S. was not gaining weight as quickly as CCHMC doctors would have liked for him to be healthy for a liver transplant. CCHMC and CHOP recommended an NG feeding tube, which CHOP placed in mid-September 2016. The tube was later removed. After Co.S. left the Snyders' custody, his weight increased at a greater rate than it had previously.

**{¶239}** Additionally, medical professionals told the Snyders that their household had to be current on vaccinations before Co.S. could be on CCHMC's liver-transplant list. But the Snyders did not procure a chickenpox vaccination for Co.S.

**{¶240}** This evidence was insufficient to support the Snyders' convictions under Counts 10 and 21, the R.C. 2919.22(A) felonious-child-endangerment convictions involving Co.S. There is no evidence that Co.S. suffered any harm resulting from the Snyders's failure to vaccinate him, to keep the NG tube in place, or to bump his weight as quickly as CCHMC wanted. There was no testimony that Co.S. was not placed on a transplant list because of his weight or lack of a chickenpox vaccination.

**{¶241}** Moreover, at the time of the trial, Co.S. had not received a liver transplant despite being out of the Snyders' custody for more than six years. The State's evidence involved only the Snyders' failure to ensure Co.S. was ready for a liver transplant. But the evidence established that Co.S. did not have an immediate need for the transplant. Moreover, the State presented no evidence that any facility removed

Co.S. from a transplant list.

**{¶242}** Further, the State presented no evidence that Co.S. suffered serious physical harm from gaining only six to eight grams per day. While Co.S.'s weight gain did not meet CCHMC's preference "to bump up [Co.S's] weight fairly quickly," there was no evidence that Co.S. was malnourished or starving. The State's experts testified that a weight gain of 30 grams per day was "fairly quick" and provided no testimony about what constituted a normal weight gain. Though Dr. Makoroff diagnosed Co.S. with "nutritional neglect," she never explained what a "nutritional neglect" diagnosis entails. And Dr. Makoroff testified that her "nutritional neglect" diagnosis was based not on Co.S.'s suboptimal weight, but on his failure to gain weight at the rate CCHMC staff wanted. The State provided no evidence from which a reasonable trier of fact could conclude that Co.S. experienced the pains associated with starvation.

**{¶243}** The State presented insufficient evidence demonstrating that the Snyders' omissions created a substantial risk to Co.S.'s health and safety or that Co.S. suffered serious physical harm. Accordingly, we reverse John's conviction on Count 10 and Kate's conviction on Count 21, and we discharge them from further prosecution on those counts.

### E. *Child endangerment: cruel abuse or torture*

**{¶244}** The trial court convicted Kate of endangering A.S. and M.S. under R.C. 2919.22(B)(2), which provides, "No person shall do any of the following to a child under eighteen years of age . . . (2) [t]orture or cruelly abuse the child."

**{¶245}** The statute does not define "torture" or "cruelly abuse." *State v. Corcoran*, 2017-Ohio-7084, ¶ 14 (1st Dist.). Courts define "torture" to mean "the infliction of severe pain or suffering (of body or mind)." *State v. Surles*, 2007-Ohio-2733, ¶ 12, quoting *State v. Nivert*, 1995 Ohio App. LEXIS 4666, *5 (9th Dist. Oct. 18,

1995), quoting *XI Oxford English Dictionary* (2d Ed. 1933); *see also Black's Law Dictionary* (11th Ed. 2019) (defining torture as the "infliction of intense pain to the body or mind to punish, to extract a confession or information, or to obtain sadistic pleasure."). "Though 'torture' encompasses the infliction of mental suffering, the suffering must be severe in nature." *State v. Brown*, 2019-Ohio-2599, ¶ 20 (9th Dist.).

**{¶246}** Courts have defined "cruelly" as "(1) demonstrat[ing] indifference to or delight in another's suffering; (2) treat[ing] severely, rigorously, or sharply." *Nivert* at *6. And courts have defined "abuse" as "ill-use, maltreat; to injure, wrong or hurt." *Id.*; *see Cocoran* at ¶ 14. This court upheld a jury instruction defining abuse as an act that causes a physical or mental injury, and that injury harms or threatens to harm a child's health or welfare. *State v. Groomes*, 2010-Ohio-4311, ¶ 12-13 (1st Dist.); *accord Johnson-Millender*, 2005-Ohio-4407, at ¶ 44 (5th Dist.).

    1) *Count 23: A.S.*

**{¶247}** On Count 23, the trial court convicted Kate of violating R.C. 2919.22(B)(2), torturing or cruelly abusing A.S. The State presented sufficient evidence to support this conviction.

**{¶248}** The State presented evidence that Kate disciplined A.S. in several ways. First, N.S. testified that the Snyders would "[l]ike, physically hurt [A.S.]. Like, punch him and stuff." Second, M.S. and N.S. both testified that the Snyders withheld food from A.S. as punishment. Finally, M.S. and N.S. testified that Kate punished the children, including A.S., for bathroom accidents by making them take cold baths or showers. N.S. testified that he knew the water was cold because he could hear his siblings screaming in the bathroom and saw them come out of the bathroom shivering. And when A.S. arrived at the ED on the day he died, his body temperature was abnormally low. While some experts suggested this was because A.S. was in the

process of dying, the State argued in closing that A.S.'s low body temperature resulted from Kate placing A.S. in a cold bath as punishment.

{¶249} Placing a child in a cold bath as punishment is a form of abuse under R.C. 2919.22(B). *See State v. Berry*, 2007-Ohio-94, ¶ 48 (6th Dist.) ("[T]he jury could permissibly infer that, beyond a reasonable doubt, appellant used 'the cold' to discipline her three year old"); *see also State v. Mabrey*, 2011-Ohio-3849, ¶ 27 (8th Dist.) ("The State's trial theory was that Mabrey used a cold water bath abusively or to punish"); *compare State v. Pepka*, 2009-Ohio-1440, ¶ 63 (11th Dist.) (defendant's act of recklessly placing child in cold water in attempt to counteract burns caused by hot water was neglect under R.C. 2919.22(A)).

{¶250} This evidence was sufficient to support Kate's conviction under R.C. 2919.22(B)(2), because those acts demonstrated cruel abuse.

### 2) *Count 24: M.S.*

{¶251} Count 24 charged Kate with abusing M.S. M.S. testified that when they were angry, both Snyders hit her and told her they hated her. And the State presented evidence that the Snyders forced M.S. to take cold showers when she had bathroom accidents. M.S.'s and N.S.'s testimony—that the Snyders hit M.S. and N.S. heard his siblings screaming when the Snyders placed them in the showers and saw them shivering—was sufficient to support Kate's conviction under R.C. 2919.22(B)(2).

### F. *Sufficiency Conclusion*

{¶252} For John, we sustain in part his eighth assignment of error. We reverse his convictions for child endangerment charged in Counts 8 and 10, and discharge him from further prosecution for those counts. For Kate, we sustain in part her sixth assignment of error. We reverse her convictions for child endangerment in Counts 19 and 21, and discharge her from further prosecution for those counts.

**{¶253}** We overrule the remainder of John's eighth assignment of error and Kate's sixth assignment of error. The State presented sufficient evidence to support both Snyders' convictions for felony murder (Counts 4 and 15), felonious assault (Counts 6 and 17), and child endangerment involving K.S. (Counts 7 and 18). And the state's evidence sufficiently supported Kate's felony child-endangerment convictions charged in Counts 23 and 24.

## VII. Manifest weight of the evidence

**{¶254}** In Kate's seventh assignment of error and John's ninth assignment of error, the Snyders argue that their convictions were contrary to the manifest weight of the evidence. Because we already reversed the Snyders' R.C. 2919.22(A) felonious child-endangerment convictions involving M.S. and Co.S., we do not address those convictions under a manifest-weight review.

### A. *Manifest-weight standard*

**{¶255}** Under a manifest-weight-of-the-evidence challenge, an appellant argues that the State failed to meet its burden of persuasion at trial. *Hurt*, 2024-Ohio-3115, at ¶ 95 (1st Dist.). Appellate courts must "review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice." *Id.*, quoting *State v. Kizilkaya*, 2023-Ohio-3989, ¶ 15 (1st Dist.), quoting *State v. Powell*, 2020-Ohio-4283, ¶ 16 (1st Dist.).

**{¶256}** A manifest-weight challenge permits an appellate court, sitting as a "thirteenth juror," to disagree with the factfinder's resolution of conflicting evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" *Id.*, quoting *Black's Law Dictionary* (6th

Ed. 1990). An appellate court's power to reverse on manifest-weight grounds and give a defendant a "second chance" at trial is discretionary and should be exercised "'in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.* at 387-388, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

**{¶257}** Though appellate courts engaging in manifest-weight analyses must independently weigh the evidence, courts of appeal must "'always be mindful of the presumption in favor of the finder of fact.'" *In re Z.C.*, 2023-Ohio-4703, ¶ 14, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 21. We defer to a jury's factual findings because the jurors personally observed the witnesses when making their credibility determinations. *Id.* Accordingly, when conflicting evidence exists on an issue, "we interpret the evidence in a manner consistent with the trial court's judgment." *State v. Rose*, 2024-Ohio-5689, ¶ 23 (1st Dist.).

**{¶258}** Several factors may assist appellate courts in reviewing a manifest-weight challenge: (1) whether evidence was contradicted, (2) if the opposing party impeached a key witness, (3) what the evidence failed to establish, (4) the evidence's certainty and reliability, (5) whether the evidence was uncertain, fragmented, or vague, and (6) whether witnesses were impartial. *Id.* at ¶ 24. Appellate courts are "not required to accept as true the incredible." *State v. Pennington*, 2024-Ohio-5681, ¶ 97 (4th Dist.), quoting *State v. Mattison*, 23 Ohio App.3d 10 (1985).

### B. *Counts 4 and 15: Felony Murder*

**{¶259}** On the felony-murder charges, the jury had to determine whether it believed evidence showing that Kate and John hit A.S.'s head on October 5, 2016, causing his subdural hematoma, and whether the State's or the Snyders' experts correctly determined A.S.'s cause of death.

**{¶260}** In his manifest-weight argument involving his felony-murder

conviction, John points out that M.S.'s trial testimony—accusing Kate and John of hitting A.S.'s head against the wall on the day he died—conflicted with what she told Brenda and what she said in her Mayerson interview, where she accused only Kate of hitting A.S.'s head. John also points to testimony showing that M.S. was not credible: Brenda testified that M.S. had falsely accused Brenda of abusing M.S. and Dube testified that she did not believe M.S. was always honest. Moreover, John argues, M.S. and N.S. were in the care of or under the influence of people that he claims were biased against the Snyders—Brenda, Melissa, and Dube. Finally, John points to M.S.'s and N.S.'s conduct on the witness stand, asserting that it "calls into question their competence to testify."

{¶261} Kate presents the same manifest-weight argument for all of her convictions. She points to several areas of conflicting evidence. First, she cites the Snyders' experts' testimony attributing A.S.'s death to other causes and opining that nonaccidental head trauma did not cause A.S.'s subdural hematoma, which had been present for days. Next, she points to Dr. Bassman's testimony and asserts that the Mayerson interviews were "significantly biased and flawed," and therefore should be given little weight. Third, Kate cites friends' testimony that they had witnessed A.S. "bash his head many times" on hard objects, that Kate hugged him to make him stop, the Snyders' home was clean, the atmosphere was happy, they were present when the children were eating, the Snyders offered the children additional food, and the Snyders were calm parents who provided appropriate care for the children. Finally, Kate points to her adult daughters' testimony, which is similar to the friends' testimony.

**{¶262}** After independently reviewing the evidence, we hold that the jury did not lose its way.

1) *Evidence that the Snyders struck A.S.'s head on October 5, 2016*

**{¶263}** M.S. testified at trial that John and Kate hit the back of A.S.'s head against a wall. She demonstrated with a water bottle and a teddy bear, showing the teddy bear striking its head against the bottle. M.S. testified that after the Snyders hit A.S.'s head, they put A.S. on the floor in the hallway and left him there for at least ten minutes without checking on him. When asked why she was afraid of Kate and John, M.S. replied, "Maybe kill me" because "[t]hey killed my brother."

**{¶264}** In her Mayerson interview, M.S. stated that "Mama" hurt A.S., demonstrating by hitting a doll representing A.S. against a table. And Brenda testified that Ca.S. told her "Mom" hit A.S.'s head and demonstrated the act while shaking.

**{¶265}** We recognize that M.S.'s accounts of what happened on October 5, 2016, contained inconsistencies. But she consistently said that the assault happened and one or both of her parents hit A.S.'s head against a hard surface. She testified at trial that after they hit A.S.'s head, the Snyders left A.S. lying in the hall for at least ten minutes without checking on him. Adult Child 1 testified that on the day A.S. died, she and Kate left with some of the children to visit the pediatrician, while A.S. remained home with John. She said that when they returned from the doctor's appointment, A.S. was in the same location—on the floor of John's office—as when they left the house.

**{¶266}** The Snyders' witnesses testified that the Snyders were level-headed, calm, and loving parents who never yelled at or hit any of their children. And the Snyders addressed at least some of the children's differing medical needs. But the jury chose to believe that the Snyders hit A.S.'s head the day he died. Nothing in the record

convinces us to second-guess the jury's determination that the Snyders assaulted A.S. on the day he died.

> 2) *The battle of the experts*

**{¶267}** The Snyders assert that the proximate cause of A.S.'s death was his own headbanging combined with other medical conditions, rather than an assault. They cite two medical experts' testimony, Dr. Auer and Dr. Dehnel.

**{¶268}** Dr. Auer testified that A.S. had Lesch-Nyhan Syndrome and died of untreated sepsis. He explained that A.S.'s brain showed "so many bacteria that they're visible at low magnification." Dr. Auer testified that Lesch-Nyhan Syndrome includes symptoms of self-harm such as head banging, breaking one's own bones, self-mutilation, and mood changes. Dr. Auer identified these symptoms in A.S.'s medical records. And Dr. Auer opined that the coroner did not perform the correct test to rule out Lesch-Nyhan Syndrome.

**{¶269}** Dr. Dehnel testified that A.S. died from underlying medical conditions that put him at risk for a "bad outcome." He explained that A.S. had an overwhelming infection, including widespread pneumonia in his lungs. Dr. Dehnel said that widespread infections cause blood vessels to leak and that A.S.'s headbanging would have added "causes of leakiness" in his skull. Further, according to Dr. Dehnel, pneumonia caused a disorder in A.S.'s coagulation system, which coupled with acute bleeding in A.S.'s brain, increased the size of the subdural hematoma and caused A.S.'s death. Dr. Dehnel opined that based on A.S.'s vitals taken the night before he died, it was more likely than not that A.S. had been developing pneumonia at that time.

**{¶270}** The State offered expert testimony involving the proximate cause of A.S.'s death. Experts testified that A.S. died because of a nonaccidental, non-self-inflicted subdural hematoma that he sustained on October 5, 2016. The State's experts

testified that A.S. did not die of sepsis and did not have an infection the night before he died. These experts ruled out the possibilities of A.S. (1) having an undiagnosed hematoma before October 5, and (2) the fatal hematoma being caused by an infection, rather than an assault.

{¶271}The parties presented the jury with conflicting medical narratives from multiple experts. Upon an independent review of this evidence, nothing convinces us that the jury was wrong to have believed the State's evidence demonstrating that the Snyders assaulted A.S. by hitting his head, and that the assault caused his death. This is not one of the rare cases in which the jury lost its way and caused a manifest miscarriage of justice.

### C. *Counts 6 and 17: felonious assault from September 1, 2016, to October 5, 2016*

{¶272} The Snyders argue that their convictions for felonious assault based on conduct other than hitting A.S.'s head on October 5 were against the weight of the evidence. We disagree.

{¶273} John argues that despite this count being unrelated to the felonious assault charged in Count 5, the State presented nothing that demonstrated upon what conduct this charge was based. Further, he asserts that there was no evidence at all that he, either independently or as an accomplice, feloniously assaulted A.S. between the relevant dates.

{¶274} In its closing, the State told the jury that the two sets of felonious-assault counts were "on two different dates." Throughout the trial, the State provided evidence that throughout his seven-month residence with the Snyders, including September 1 through the day he died, A.S.'s parents neglected him nutritionally and medically. A parent's knowing failure to care for a child constitutes felonious assault where that

failure results in serious physical harm. *Elliott*, 104 Ohio App.3d at 817-818.

{¶275} A.S.'s medical records showed that he was severely malnourished. A nurse testified that A.S. looked "emaciated," like he had been "hungry and sick for a while." While the Snyders provided testimony that A.S. refused to eat and they attempted to find alternate ways to feed him, that testimony originated from the Snyders themselves and the jury did not have to believe it. And even if the jury believed that A.S. refused to eat, as the Snyders claimed, Kate told a CCHMC employee on October 4 that the Snyders had not taken A.S. to his primary care doctor in more than six weeks, despite A.S. having lost a substantial amount of weight and appearing emaciated. These felonious-assault convictions were based, in part, on medical neglect. The jury may have determined that the Snyders' failure to get medical care for a child who refused to eat and appeared emaciated constituted causing A.S. serious physical harm.

{¶276} Moreover, A.S. had several large bedsores, some approaching "grade 4," which can be fatal. Medical treatment is necessary to treat these wounds to "prevent pain, progression and infection." A bedsore on A.S.'s back had "necrotic appearing tissue." A medical expert testified that these bedsores would not have developed in one day. The jury could have determined that the Snyders' failure to ensure A.S. received medical care for these painful, dangerous wounds caused him serious physical harm.

{¶277}The jury chose to believe that the Snyders failed to provide A.S. proper nutrition and/or medical care. Their convictions on Counts 6 and 17 are not against the manifest weight of the evidence.

#### D. *Endangerment counts*

{¶278} Because we reversed John's and Kate's convictions on Counts 8, 10, 19, and 21, and discharged them on those counts, their manifest-weight challenges to

77

these counts are moot.

1) *Endangering K.S. by violating a duty of care*

**{¶279}** On Counts 7 and 18, John and Kate were convicted of child endangerment in violation of R.C. 2919.22(A) for violating a duty of care, which "create[ed] a substantial risk to the health and safety" of their child K.S., and resulted in serious physical harm to K.S.

**{¶280}** Kate failed to develop a manifest-weight argument related to her Count 18 conviction. Likewise, John makes no specific argument to demonstrate that his Count 7 conviction was contrary to the manifest weight of the evidence. He asserts that the State produced no evidence that any of his conduct "caused serious physical harm" to the children.

**{¶281}** A manifest-weight review requires this court to consider conflicting evidence. But neither of the Snyders point to any conflicting evidence specific to K.S.

**{¶282}** Furthermore, the State presented evidence showing that K.S. had been diagnosed with medical and nutritional neglect, she gained hardly any weight over a seven-year period, and K.S. would have experienced hunger pains.

**{¶283}** The Snyders' child-endangerment convictions in Counts 7 and 18 were not contrary to the manifest weight of the evidence.

2) *Child-endangerment of A.S. (Kate)*

**{¶284}** Count 23 alleged that Kate endangered A.S. by torturing or cruelly abusing him. Kate engages in a lengthy argument about why her child-endangerment conviction involving A.S. was contrary to the weight of the evidence. The Snyders presented evidence involving their parenting styles, their efforts to care for A.S., and what caused A.S.'s death.

**{¶285}** But the jury chose to believe the State's evidence. And that evidence

showed that Kate forced A.S. to take cold baths and withheld food from A.S. as a punishment, which inflicted on A.S. severe pain or suffering. A.S. was severely malnourished, such that he appeared emaciated and like he had been hungry and sick for a long time. And N.S. testified that he heard his siblings screaming in the bathroom and saw them shivering afterwards.

**{¶286}** Kate's child-endangerment conviction involving A.S. was not against the weight of the evidence.

### 3) *Child-endangerment of M.S. (Kate)*

**{¶287}** Count 24 alleged that Kate endangered M.S. via cruel abuse or torture. Kate points out that the children had serious medical issues when the Snyders adopted them, that M.S. had "significant delays," and that Kate ensured M.S. received appropriate medical treatment. She asserts that although M.S. had speech and hearing delays, after ten months in the Snyders' care, M.S. had made progress.

**{¶288}** Whether M.S. had medical issues and delays, or made developmental progress while living with the Snyders, is irrelevant to whether Kate's conviction for torturing or cruelly abusing M.S. was against the weight of the evidence.

**{¶289}** The State presented evidence that the Snyders hit M.S., withheld food, isolated her, and forced M.S. to take cold showers, all as punishment for her having bathroom accidents. M.S. testified that Kate hurt her and told M.S. she wished M.S. were dead. N.S. testified that he heard his siblings screaming in the bathroom. Kate's conviction on Count 24 was not contrary to the manifest weight of the evidence.

**{¶290}** We overrule John's ninth and Kate's seventh assignments of error.

## VIII. **New-trial motion**

**{¶291}** In her eighth assignment of error, Kate asserts that the trial court abused its discretion when it denied her motion for a new trial. She cites five issues

that she asserts materially impacted her rights: (1) the State's case-in-chief lasting two weeks beyond the time it predicted it would use; (2) the State's generating new exhibits during trial; (3) the State's presenting evidentiary arguments in bench briefs during trial instead of pretrial motions in limine; (4) the trial court's prohibiting the Snyders from discussing the statute of limitations; and (5) the trial court's precluding the Snyders from presenting to the jury Adult Child 1's Mayerson interview.

## A. *Crim.R. 33 new-trial motions*

**{¶292}** An appellate court reviews a trial court's ruling on a new-trial motion for an abuse of discretion. *State v. Wright*, 2024-Ohio-851, ¶ 41 (1st Dist.).

**{¶293}** Relevant here, a court may grant a defendant's new-trial motion when one of the following materially affected the defendant's substantial rights: (1) the defendant did not get a fair trial due to the trial court abusing its discretion or an irregularity in either the proceedings or trial court orders; (2) misconduct by a juror, prosecutor, or state witness; (3) accident or surprise against which the defendant could not have guarded with ordinary prudence; (4) a verdict that is contrary to law; or (5) an error that occurs during trial. Crim.R. 33(A)(1)-(5).

## B. *The trial court did not abuse its discretion*

**{¶294}** Kate first argues that an irregularity in the proceedings occurred based on the State's case-in-chief lasting two weeks beyond the expected time frame. Kate claims that "this caused defense witness to be excised due to concerns of jury exhaustion." Kate cites nothing in the record showing jury exhaustion or that her witnesses had "to be excised." And Kate points to no legal authority showing that the State's longer-than-expected case-in-chief serves as a basis for a new trial. And following the Snyders' second expert's testimony, they told the court that they had no more witnesses. The record contains no indication that the trial court limited the

length of Kate's defense or refused her request to call additional witnesses.

**{¶295}** Second, Kate argues that because the State produced exhibits during trial just before introducing them, she is entitled to a new trial based on surprise under Crim.R. 33(A)(3). At trial, the Snyders complained more than once that just before a State's witness testified, the State would produce an exhibit with excerpts from discovery. Kate asserts that this was unfair because the State used medical records that it represented it would not use. But she does not identify any part of the record in which the State used records it represented it would not use.

**{¶296}** Third, Kate asserts that the State filed bench briefs contesting the admissibility of testimony immediately before the witnesses testified, rather than filing motions in limine before trial. She asserts that Dr. Bassman's testimony was truncated. But Kate did not request a continuance to review and respond to the State's bench briefs. In other contexts, the Supreme Court of Ohio has held that a party forfeits any claim of prejudice where the party fails to move for a continuance after surprise arises. *See State v. Brown*, 2024-Ohio-749, ¶ 37. Kate cannot claim prejudice due to surprise because she did not seek a continuance to mitigate any surprise.

**{¶297}** Fourth, Kate argues that the trial court abused its discretion by precluding her "from presenting evidence beyond cross and from using the term 'statute of limitations.'" Kate develops no legal argument as to whether this evidence was admissible at trial or how its exclusion prejudiced her. We decline to develop an argument on her behalf. *See Guthrie v. Guthrie*, 2024-Ohio-5581, ¶ 12 (1st Dist.); *see also* App.R. 16(A)(7).

**{¶298}** Finally, Kate asserts that the trial court abused its discretion by including M.S.'s Mayerson interview while excluding Adult Child 1's Mayerson interview. Kate asserts that Adult Child 1's interview attacks the credibility of the

interviewer's opinions and showed that Adult Child 1 denied observing any abuse in the home. Kate cites no authority showing the relevancy of a forensic interview involving a person who testified that she had not been abused. She does not point to any of Hicks's opinions or explain how this evidence would have attacked Hicks's credibility. Finally, Adult Child 1 testified at trial, so the jury heard her assertion that the Snyders were loving parents who did not hurt their children.

**{¶299}** We overrule Kate's eighth assignment of error.

## IX. **Consecutive sentences**

**{¶300}** In her tenth assignment of error, Kate asserts that the record does not support the trial court's imposition of consecutive sentences.

### A. *Sentencing statutes and appellate review*

**{¶301}** Ohio law carries a presumption that sentences for multiple offenses should be served concurrently. R.C. 2929.41(A). Before a trial court may impose consecutive sentences, the court must make certain findings under R.C. 2929.14(C)(4). Relevant here, the trial court had to find that consecutive sentences were (1) needed to protect the public or punish Kate; (2) "not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public;" and that (3) Kate committed multiple offenses in the same course of conduct and the harm caused by the multiple offenses "was so great or unusual that no single prison term . . . adequately reflects the seriousness of the offender's conduct." R.C. 2929.14(C)(4)(b).

**{¶302}** Our review of felony criminal sentences is governed by R.C. 2953.08. *State v. Gwynne*, 2023-Ohio-3851, ¶ 11. A reviewing court "must have a firm belief or conviction that the record does not support the trial court's [R.C. 2929.14(C)(4)] findings before it may increase, reduce, or otherwise modify consecutive sentences."

*Id.* at ¶ 15.

## B. *The record supports consecutive sentences*

**{¶303}** There is no dispute that the trial court made the required R.C. 2929.14(C)(4) findings. Kate instead asks this court to hold that the record clearly and convincingly does not support those findings. She points out that she had no criminal history and the Snyders adopted children with "extreme pre-existing difficulties," fed them, sheltered them, and cared for them. She also argues that the facts supporting her child-endangerment convictions did not constitute the worst form of the offense because her acts and omissions were not preplanned or committed out of malice.

**{¶304}** We disagree. Kate chose to starve her children or to forego medical care when her children were severely malnourished—or both. Kate's choice to allow her children to starve certainly was preplanned and likely the product of malice. Additionally, Kate taped A.S.'s hands to his body, restricting his movement, and failed to ensure that he received medical treatment for the resulting severe bedsores. Kate punished A.S. and M.S. by hitting them, withholding food, and forcing them to take cold showers, leading to them screaming in pain and shivering.

**{¶305}** Nothing in the record causes us to have "a firm belief or conviction" that the trial court's R.C. 2929.14(C)(4) findings were not supported by the record. We overrule Kate's tenth assignment of error.

## John's Assignments of Error[4]

### I. Vouching

**{¶306}** John's first assignment of error asserts that the trial court abused its discretion by allowing Melissa to vouch for Nancy's credibility and permitting the

---

[4] As Kate adopted and incorporated John's appellate arguments, the disposition of each of John's assignments of error apply to both Kate and John.

children's therapist, Dube, to vouch for the children's truthfulness.

## A. *Standard of review*

**{¶307}** An appellate court generally reviews a trial court's evidentiary rulings for an abuse of discretion. *State v. Williams*, 2020-Ohio-1367, ¶ 23 (1st Dist.). But a party's failure to object to testimony forfeits all but plain error. *State v. Denson*, 2023-Ohio-847, ¶ 24 (1st Dist.).

## B. *Vouching*

**{¶308}** A lay witness may provide opinions or inferences only when they (1) are rationally based on the witness's perception, and (2) help the factfinder gain a clear understanding of that witness's testimony or determine a fact at issue. Evid.R. 701. This is because the finder of fact, rather than witnesses, must decide whether and to what extent a witness is credible and truthful. *State v. Eastham*, 39 Ohio St.3d 307, 312 (1988). A witness may not express an opinion about whether another witness is being truthful. *State v. Smith*, 2017-Ohio-9283, ¶ 46 (10th Dist.). But bolstering testimony that "provides 'additional support for the truth of the facts testified to by [a] child, or which assists the fact finder in assessing [a] child's veracity,' is permitted." *State v. Svoboda*, 2021-Ohio-4197, ¶ 93 (1st Dist.), quoting *State v. Stowers*, 81 Ohio St.3d 260, 263 (1998).

### 1) *Melissa vouched for her mother's veracity*

**{¶309}** John asserts that the trial court's admitting the Nancy and Melissa emails was error and that the error's "prejudicial impact" was compounded when it allowed Melissa to vouch for Nancy's credibility.

**{¶310}** During Melissa's testimony, she explained that Nancy had shared concerns about the Snyders' children and was "trying to get [Melissa] to do something." Melissa decided to visit the Snyders and Nancy so she could "see for

[her]self."[5] Melissa testified, "The concerns were that there was a lot of yelling in the house, that [the children] were being disciplined harshly, that [the Snyders] weren't being nice, and they were overreacting to toileting problems." Though the testimony is not completely clear, it appears that the "concerns" Melissa said Nancy shared with her were those expressed in the Nancy and Melissa emails.

**{¶311}** After she described her mostly unsuccessful attempt to spend time with the children, the State asked, "Did you have a fear about what was happening to the children in the Snyder home?" Melissa answered yes, explaining, "My mom was not prone to making up stories." On redirect, the State asked, "Do you believe, when you were told that there was yelling in the house, that your mom was lying?" Melissa said, "No." The trial court overruled the Snyders' objections to both questions. Later, during Lieutenant Wilcher's testimony, he read the Nancy and Melissa emails into the record.

**{¶312}** The State concedes that Melissa's testimony that her mother was not lying when she told Melissa that the Snyders yelled a lot was an express comment on Nancy's credibility and was therefore inadmissible. But the State argues that Melissa's testimony that Nancy was not prone to making up stories was permissible lay witness testimony under Evid.R. 701.

**{¶313}** We agree with the parties that Melissa's testimony that Nancy was not lying when she told Melissa about the Snyders' yelling at their children was impermissible vouching.

**{¶314}** And we agree with John that Melissa's statement during cross-examination—her mother was not prone to making up stories—constituted impermissible vouching. Melissa said she was fearful for the children because Nancy

---

[5] Checking on the children was only part of the reason she visited.

was not "prone to making up stories." The only reasonable way to interpret Melissa's statement is that Melissa believed Nancy was not lying when she shared her concerns about the children with Melissa. In other words, Melissa vouched for Nancy's truthfulness about her concerns for the children, and this was impermissible vouching.

*2) Harmless error*

{¶315} Although the trial court abused its discretion by admitting Melissa's vouching testimony, we must now determine whether admitting that testimony was harmless error.

{¶316} We hold that Melissa's vouching for Nancy's truthfulness was harmless. As the State points out, most of Melissa's testimony involved her own observations from her visit to the Snyders' house. Further, other witnesses testified that the "concerns" shared by Nancy to Melissa were true. M.S. and N.S. testified that Kate and John frequently yelled at the children. Both testified that the Snyders hit the children when they had bathroom accidents. Melissa's vouching was harmless error.

*3) Dube's therapy notes*

{¶317} Next, John argues that Dube, the children's therapist, improperly vouched for the children's credibility.

{¶318} First, John contends that Dube vouched for the children's credibility by reading her therapy notes to the jury. But the defense elicited this testimony on cross-examination. Even if the admission of this evidence was error, the Snyders invited that error. *See State v. Cephas*, 2019-Ohio-52, ¶ 24. The Snyders cannot rely on this evidence to show error on appeal.

{¶319} Next, John challenges five portions of Dube's testimony during the State's direct examination as impermissible vouching. The Snyders did not object to any of these statements, and we therefore review them for plain error. *Denson*, 2023-

Ohio-847, at ¶ 24 (1st Dist.). We address these statements individually.

**{¶320}** Statement 1: Compared to when they started therapy, Ca.S. and N.S. were more confident "in what they think and believe, what they know to be true, how they feel so … more validated, more sure of themselves, more determined." This testimony does not vouch for the children. Instead, Dube provided her own observations of how the children had progressed throughout therapy.

**{¶321}** Statement 2: N.S. suffers from PTSD due to "the knowledge that his brother was hurt in the home, and it led to them being taken out." This statement does not say that the Snyders were responsible for A.S. being hurt in the home. And it is indisputable that A.S. was hurt before he died and that his death led to the children being removed from the Snyders' custody. This was not vouching.

**{¶322}** Statement 3: M.S. has PTSD, which stemmed from "when she witnessed what happened to her brother and she was also treated punitively."[6] First, these statements clearly were Dube recalling what M.S. told her. And nothing in this portion of Dube's testimony states that M.S. witnessed the Snyders harming her brother or that the Snyders harmed her.

**{¶323}** Statements 4 and 5: The State asked Dube if, when discussing what happened to A.S., she "put words in [the children's] mouths," Dube replied that she allowed the children to tell her what happened and she responded accordingly. John challenges Dube's testimony that when M.S. reported, "'[M]om hurt A.S.' I say, 'Wow, that must be difficult. I can see you feel upset about that. . . . I focus on their thoughts and feelings and validate that.'" This does not constitute vouching. Rather, it is a therapist making a child feel heard and validated.

---

[6] John objected after Dube provided details about the punitive treatment. But he did not object to Dube's testimony that M.S. was "treated punitively."

**{¶324}** The trial court did not err by admitting Dube's testimony. And the admission of Melissa's vouching testimony was harmless. We overrule John's first assignment of error.

## II. M.S.'s and N.S.'s competency

**{¶325}** In his fourth assignment of error, John argues that the trial court erred by finding that M.S. and N.S. were competent to testify.

**{¶326}** The court reviews a trial court's determination that a witness is competent to testify for an abuse of discretion. *State v. Curtiss*, 2022-Ohio-146, ¶ 125 (12th Dist.). Generally, "Every person is competent to be a witness." Evid.R. 601(A). But a trial court may deem potential witnesses unqualified to testify if it determines the person cannot (1) express themselves about "the matter" in an understandable manner, either directly or through an interpreter, or (2) understand that a witness is bound to tell the truth. Evid.R. 603(B)(1)-(2).

**{¶327}** The trial court held in-camera competency hearings with N.S. and M.S. N.S., who was 12 years old, could accurately answer the trial court's questions. For example, when the trial judge asked N.S. to identify the color of her robe, he answered that it was black. He told her that if she had said her robe was red, that would be a lie, and it was bad to lie. N.S. said that when someone tells a lie, they should apologize and "make things straight." N.S. promised to tell the truth. Likewise, M.S., aged 14, correctly answered the trial court's questions. She explained that it was not okay to tell a lie. When the court asked if M.S. would promise to tell the truth, M.S. said yes and "pinky promised" the trial judge. Thus, both children accurately answered questions and indicated they understood the importance of telling the truth.

**{¶328}** John asserts that the trial court's questions were "basic" and failed to establish the children's competency. But we see nothing in the record showing that the

trial court abused its discretion in finding the children competent to testify. Appellate courts review these determinations for an abuse of discretion, rather than de novo, because the trial court is in the best position to determine a potential witness's competency—it is the trial court that observes and hears the person whose competency is at issue.

**{¶329}** John also argues that even if the in-camera interview sufficiently established the children's competency, Dr. Staat's testimony, Hicks's testimony, and the children's behavior "'on the witness stand' indicated otherwise." But John failed to develop an argument in his initial brief to support that this "additional information" showed that the children were incompetent to testify. Instead, that argument appeared in his reply brief. This court will not consider arguments raised for the first time in a reply brief. *State v. Pitts*, 2022-Ohio-4172, ¶ 14 (1st Dist.).

**{¶330}** We overrule John's fourth assignment of error.

### III. Limiting Dr. Bassman's testimony

**{¶331}** John asserts in his fifth assignment of error that the trial court abused its discretion by prohibiting Dr. Bassman from reviewing Dube's trial testimony before he testified and limiting the scope of Dr. Bassman's criticism of Hicks's forensic interviews.

#### A. *Separation Order*

**{¶332}** Appellate courts review a trial court's order separating witnesses, including experts, for an abuse of discretion. *In re Kube*, 1990 Ohio App. LEXIS 4766, *2 (3d Dist. Oct. 31, 1990); *see State v. Jones*, 1980 Ohio App. LEXIS 10068, *18 (4th Dist. July 14, 1980).

**{¶333}** In a discussion away from the jury, the State informed the trial court that based on off-the-record discussions, it believed the Snyders wanted Dr. Bassman

to review Dube's trial testimony. The trial court stated, "Absolutely not. You can't do that. There's a separation of witnesses." The defense then explained that the issue was no longer relevant because counsel "made the conscious decision not to talk to [Dr. Bassman] about the testimony of any other witnesses" because of the opposition from the State.

{¶334} John notes that Evid.R. 703 contemplates that there may be occasions in which an expert must base an opinion on in-court testimony. But the Snyders "made the conscious decision" to forego questioning Dr. Bassman about other witnesses' testimony. Indeed, the Snyders never asked the court to allow Dr. Bassman to review Dube's testimony. There is no error.

### B. *Limitation of Dr. Bassman's testimony*

{¶335} We review the admission or exclusion of expert testimony for an abuse of discretion. *State v. Garrett*, 2010-Ohio-5431, ¶ 35 (1st Dist.).

{¶336} Generally, a witness may not express an opinion as to whether another witness is being truthful. *Smith*, 2017-Ohio-9283, at ¶ 46 (10th Dist.). But defendants may present testimony involving "the proper protocol for interviewing child victims regarding their abuse. Rather than infringing upon the fact finder's role, such testimony assists the trier of fact." *State v. Gersin*, 76 Ohio St.3d 491, 493 (1996). Accordingly, when State witnesses rely on forensic interviews for their testimony, "[h]ow that information was obtained and the accepted protocols on how to obtain such information certainly are relevant." *Id.* at 494. As such, defendants should be permitted to cross-examine State witnesses about how they obtained their information, and defendants may present their own expert witnesses to explain to the jury the ideal way such information should be obtained. *Id.* at 494-495; *see State v. Huebner*, 2023-Ohio-2803, ¶ 87 (6th Dist.) (proffered testimony of a defense expert

witness, who would have testified that he had reviewed the child's forensic interview and would have opined on the proper protocol for interviewing child victims, was relevant and excluding this testimony was error). "Meanwhile, the ultimate issue of the particular child's veracity is left to the jury." *Gersin* at 495.

{¶337} John challenges the trial court's ruling limiting the scope of Dr. Bassman's testimony. First, John takes issue with the court prohibiting Dr. Bassman from testifying about whether Dube's therapy notes raised any concerns involving "whether she was maintaining … the standards for therapy with children." The court sustained the State's objection because the notes themselves were "just her notes," not therapy. This ruling was not an error. While Dr. Bassman could have testified about whether the notes themselves met the standard of care, because he did not personally observe the children's therapy sessions with Dube, he had no basis for testifying about whether the therapy sessions met any standards. Witnesses cannot provide opinions on topics about which they have no knowledge. *See* Evid.R. 602.

{¶338} Second, John asserts that the trial court impermissibly limited Dr. Bassman's testimony critiquing the children's forensic interview. But John fails to point out any specific instances in which the trial court limited Dr. Bassman's testimony critiquing Hicks's interviews. His argument about this issue is a conclusion that the trial court's imposing limits was a legal error and an abuse of discretion. It is not this court's role to comb the record to find errors for an appellant. *See White v. White*, 2014-Ohio-1288, ¶ 8 (2d Dist.); *Kevin O'Brien & Assocs. Co., LPA v. PLS Fin. Solutions of Ohio*, 2024-Ohio-3170, ¶ 46 (10th Dist.). Moreover, the trial court did permit the Snyders to elicit substantial testimony involving the appropriateness of the forensic interviews. Dr. Bassman testified that he had reviewed Hicks's interviews with M.S. and N.S. at the Mayerson Center and that he was "very concerned" about what he

had observed. He described specific problems with Hicks's interview with M.S.: the way Hicks welcomed M.S. into the room, Hicks's failure to establish an appropriate rapport, Hicks's failure to tell M.S. that "she wasn't in trouble," Hicks's delay in asking M.S. if she knew why she was there (which he described as a "significant mistake"), and Hicks's use of a doll to help communicate abuse, which he described as "too controversial."

**{¶339}** We find no error in the trial court's rulings involving Dr. Bassman and we overrule John's fifth assignment of error.

## IV. **Excluding Adult Child 1's Mayerson interview**

**{¶340}** In his sixth assignment of error, John asserts that the trial court abused its discretion by excluding Hicks's interview with Adult Child 1 at the Mayerson Center. The trial court refused to admit any statements from that interview into evidence. John asserts that this ruling precluded him from using Adult Child 1's forensic interview statements to "impeach [Hicks's] findings and opinions of abuse in the Snyder home."

**{¶341}** The Snyders proffered the excluded evidence. But on appeal, John fails to specify any of Adult Child 1's statements in her Mayerson interview that he would have used to impeach Hicks. And John specifies no opinions or findings that Hicks offered at trial, let alone any opinion or finding that he could have impeached with Adult Child 1's Mayerson interview statements.

**{¶342}** The trial court did not abuse its discretion. We overrule John's sixth assignment of error.

## V. **Prosecutorial misconduct**

**{¶343}** John's seventh assignment of error asserts that prosecutorial misconduct deprived him of his right to due process and a fair trial. He argues that the

State engaged in misconduct when prosecutors (1) referred to the Nancy and Melissa emails as substantive evidence, (2) failed to identify which medical records it intended to use at trial as required by the trial court's orders, and (3) "sabotaged" the defense with mid-trial objections and bench briefs.

### A. *Review*

**{¶344}** Prosecutorial misconduct warrants the reversal of a conviction where the prosecutor's improper conduct deprived the defendant of a fair trial. *State v. Yeban*, 2024-Ohio-2545, ¶ 25 (1st Dist.). "'The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor."'" *Id.*, quoting *State v. Lang*, 2011-Ohio-4215, ¶ 155, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

**{¶345}** Reviewing claims of prosecutorial misconduct requires two steps. First, we decide if the State's conduct was improper. *State v. Brinkman*, 2022-Ohio-2550, ¶ 49. If so, we then must determine whether the improper conduct "prejudicially affected the defendant's substantial rights." *Id.*, quoting *State v. Kirkland*, 2020-Ohio-4079, ¶ 115. A defendant's failure to object to prosecutorial misconduct waives all but plain error. *State v. Whitaker*, 2022-Ohio-2840, ¶ 85.

### B. *Emails*

**{¶346}** Prosecutors generally receive "a wide degree of latitude during closing arguments." *Yeban* at ¶ 26. But a prosecutor may not invite the jury to "reach its decision on matters outside the evidence adduced at trial." *State v. Hart*, 94 Ohio App.3d 665, 672 (1st Dist. 1994). For this reason, a prosecutor cannot suggest that statements not offered for the truth of the matter asserted constitute substantive evidence of the matter asserted. *State v. Wilson*, 2002 Ohio App. LEXIS 1854, *20-21 (1st Dist. Apr. 19, 2002).

**{¶347}** John did not object to the State's references to the Nancy and Melissa

emails in its closing argument, so we review to determine if John would not have been convicted but for the State's improper conduct. *State v. Davis*, 2021-Ohio-1693, ¶ 78.

{¶348} The trial court admitted the emails under Evid.R. 803(3)'s state-of-mind exception. John argues that the State "ignored the limited purpose" of the trial court's admission of these emails (demonstrating Nancy's state of mind when she wrote the emails) and instead urged the jury to use the statements to prove the truth. The State told the jury that "the behavior started" when A.S. had been in the Snyders care for about two months and two weeks. It urged the jury to "coordinate and collate the times of what Nancy [] said was happening in the home at the time." The State moved to other topics and later read the emails to the jury, ending with, "That's May. That's when the wheels came off . . . John didn't do anything."

{¶349} To the extent that the State went beyond the limited purpose for which the trial court admitted the Nancy and Melissa emails, it is difficult to imagine how telling the jury that the emails showed "the wheels came off" in May 2016 constituted prosecutorial misconduct. That certain behaviors began in May 2016 may have been relevant to charges for which the jury acquitted the Snyders. But John fails to explain how the State using the emails to argue when "the behavior started" is relevant to the charges for which the jury convicted him. Moreover, as discussed above, the Nancy and Melissa emails did not say that the Snyders were doing anything constituting an element of the offenses for which they were convicted. Considering the overall evidence, we cannot say that this conduct rises to plain error.

### C. *Mid-trial exhibits and bench briefs*

{¶350} John argues that the State committed misconduct by not identifying before trial which medical records it intended to use as exhibits "as required by the trial court's" pretrial orders and by "sabotaging" the defense with mid-trial objections

and bench briefs.

**{¶351}** John does not specify any exhibits that caused him surprise or prejudice and develops no argument as to why this conduct constituted misconduct, or how these exhibits caused him prejudice, other than asserting that the State's conduct was in contravention of a pretrial order. Even if this was misconduct, we cannot find prejudice when John fails to explain how the particular content of a surprise exhibit rendered his trial unfair. And to the extent John asserts that the State violated the trial court's pretrial orders involving deadlines for exhibits, he does not point us to where in the record such an order exists or what that order stated.

**{¶352}** And John's assertion that the State's using bench briefs during trial constituted prejudicial misconduct also fails. John refers to the portion of his fifth assignment of error involving the trial court limiting some of Dr. Bassman's testimony. If the State's conduct constituted misconduct, John cannot demonstrate prejudice. Like in his fifth assignment of error, John fails to point out specific instances where the trial court limited Dr. Bassman's testimony. He does not explain what testimony Dr. Bassman would have provided or how specific excised testimony prejudiced him.

**{¶353}** We overrule John's seventh assignment of error.

## VI. <u>Jury instructions</u>

**{¶354}** John argues that the trial court committed plain error when it failed to provide the jury with instructions or verdict forms specifying what conduct formed the basis for the felonious-assault charge under Count 6.

### A. *The parties and the court jointly created the jury instructions*

**{¶355}** The Snyders and the State participated in a lengthy charge conference with the trial court.

> THE COURT: Count 6, this is felonious assault. Count 6. The

same language, correct, except --

[The State]: It's just a different time period, Your Honor.

THE COURT: Different time period. Okay?

[Counsel for Kate]: (Nods head.)

THE COURT: Let me ask you this, because I'm just a stickler for real clarity. I don't want the jury to look at Count 5 and think it's the same as Count 6. It's not. It's a different time period. Should we bold the time period?

[The State]: Yes.

THE COURT: Okay. Let's bold the time period in Count 5 and then bold the time period in Count 6. That way they know.

[Counsel for John]: Your Honor, I would just say in regards to Count 6, and the State can correct me, I don't think it should be the 6th day of October.

THE COURT: Okay.

[Counsel for John]: I think you guys said either the 4th or the 5th.

[The State]: That was a typo. In the indictment it is the 5th.

THE COURT: Okay. So Count 6 should be 1st day of September, 2016, to on or about the 5th day of October?

[The State]: Correct.

{¶356} After discussing defined terms, the trial court asked if the parties were finished with the instructions for Count 6. The State and the Snyders explicitly confirmed they were finished editing that jury instruction.

### B. *John waived any error*

**{¶357}** John did not simply fail to object to the jury instructions, which would have caused us to review for a plain error. Instead, John and Kate fully participated in crafting the jury instructions' language and expressly assented to the trial court's instruction on Count 6.

**{¶358}** This court considered a similar issue in *In re A.G.*, 2021-Ohio-3185 (1st Dist.). There, on appeal, the defendant challenged the trial court's admission of a crime victim's in-court identification of the defendant. *Id.* at ¶ 11. During trial, the victim identified the defendant. *Id.* at ¶ 12. The State asked the trial court for the record to reflect that the victim had identified the defendant. *Id.* The court asked defense counsel, "Any objection?" *Id.* Defense counsel responded, "No objection to the in-court identification." *Id.* This court held that the defendant had "explicitly waived any error" involving the in-court identification. *Id.* at ¶ 13. We explained, "'Waiver is the intentional relinquishment or abandonment of a right, and waiver of a right "cannot form the basis of any claimed error under Crim.R. 52(B)."'" *Id.*, quoting *State v. Payne*, 2007-Ohio-4642, ¶ 23, quoting *State v. McKee*, 2001-Ohio-41, fn. 3 (Cook, J., dissenting). We held that when a defendant explicitly waives a right, that waiver "extinguishes a claim of plain error" and "the appellate court's review ends, unless there is a finding of structural error." *Id.*

**{¶359}** John does not assert structural error. And John participated in drafting the jury instructions. John pointed out a typographical error, which the trial court corrected. After a lengthy discussion about Count 6, the trial court began to move to Count 7, but paused. The court then asked if the parties were "finished with Count 6," and John's counsel stated that there was nothing more to discuss involving the jointly-drafted jury instructions on Count 6.

97

**{¶360}** This was not a failure to object. Nor is it merely a party telling the trial court that it does not object. Instead, John *actively participated* in drafting the jury instruction on Count 6 and approved the instruction's language. John cannot now claim that the jury instruction was error.

**{¶361}** We overrule John's tenth assignment of error.

## VII. <u>Ineffective assistance of counsel</u>

**{¶362}** John's eleventh assignment of error argues that his trial counsel was ineffective. We disposed of John's first argument along with Kate's ineffective-assistance-of-counsel claim under her fourth assignment of error, which involved whether contaminated bath water caused A.S.'s infection.

**{¶363}** John argues that his counsel was ineffective for failing to object to the "trial court's time limit on defense case-in-chief." John asserts that after the State rested, the trial court ordered the Snyders to complete their case-in-defense by a certain date. John concedes that the "directive occurred off the record," but he asserts that it was memorialized in John's post-trial new-trial motion.

**{¶364}** John's brief in support of his motion for a new trial did state that during an off-the-record meeting with the trial court and all counsel, he was "advised" that his case had to be completed by a certain date. But John did not say who advised him, whether it was an order or a suggestion, or any other information about that advisement. And critically, John did not attach affidavits or any other material to corroborate his assertion. We will not consider vague unsworn assertions about an off-the-record conversation to hold that a defendant was deprived of the right to counsel.

**{¶365}** We overrule John's eleventh assignment of error.

## VIII. <u>Kate's ninth assignment of error: cumulative error</u>

**{¶366}** Kate's ninth assignment of error asserts that even if the errors she

identified were individually harmless, they cumulatively warrant reversal.[7] Because Kate adopted John's appellate brief, we include the error we identified raised only by John—improper vouching—in our consideration of cumulative error.

**{¶367}** The Supreme Court of Ohio has explained when a trial court commits multiple errors that are individually harmless, those errors may still warrant reversal where the "cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial." *State v. DeMarco*, 31 Ohio St.3d 191, 197 (1987). To reverse on cumulative-error grounds, a reviewing court must find (1) that the trial court committed errors at trial, and (2) absent the errors, a reasonable possibility exists that the trial outcome would have been different. *State v. Johnson*, 140 Ohio App.3d 385, 391 (1st Dist. 2000); *State v. Mincey*, 2023-Ohio-472, ¶ 54 (1st Dist.).

**{¶368}** We identified three individually-harmless errors: the trial court's admission of (1) the Nancy and Melissa emails, (2) Melissa's testimony vouching for her mother's credibility, and (3) Brenda's testimony recalling M.S.'s and N.S.'s statements and demonstration involving the day A.S. died.

**{¶369}** Kate conceded at oral arguments that the Nancy and Melissa emails did not establish any element of her felony-murder or felonious-assault convictions.[8] And because Melissa's vouching involved her mother's credibility related to the content of the emails, that testimony did not establish any element of Kate's felony-murder or felonious-assault convictions. As such, we do not consider whether these

---

[7] John's brief concludes by asserting, "The prejudicial impact of [the asserted errors], either cumulatively or standing alone, is demonstrated." But John did not present cumulative error as its own assignment or issue for review, and failed to develop an argument involving cumulative error. We decline to develop one for him. *See Fontain v. Sandhu*, 2021-Ohio-2750, ¶ 15 (1st Dist.).

[8] At oral argument, the panel asked Kate's counsel if "any part of the email [established] any element of the charged crimes?" Counsel responded, "No I don't think it did. It went more toward bolstering the case. . . . [The email said Kate] was over-disciping the kids. So maybe it went . . . toward the child endangering elements . . . causing harm to the children. In terms of what happened to A[.S.], probably not."

two errors affected the jury's decision to find Kate guilty of felonious assault and felony murder. That leaves only Brenda's hearsay testimony, and a single error cannot establish cumulative error. *See State v. Baber*, 2021-Ohio-1506, ¶ 37 (1st Dist.) (explaining that cumulative error can occur only if there are multiple instances of harmless error).

**{¶370}** Turning to the child-endangerment charges, we reversed Kate's R.C. 2919.22(A) convictions involving M.S. and Co.S. The evidence supporting Kate's R.C. 2919.22(A) conviction for endangering K.S. involved only her nutrition and weight, not the Snyders' yelling or harsh discipline. As such, the trial court's admission of the Nancy and Melissa emails and Melissa's vouching for their mother's credibility was irrelevant to the child-endangerment conviction involving K.S.

**{¶371}** That leaves Kate's R.C. 2919.22(B)(2) convictions for endangering A.S. and M.S. via torture or cruel abuse. As discussed, Kate's R.C. 2919.22(B)(2) conviction involving A.S. was supported by M.S.'s and N.S.'s testimony that she punished A.S. by hitting him, withholding food, and forcing him to take cold showers. The count related to M.S. was similarly supported by evidence that Kate hit M.S. and forced her to take cold showers as punishment for bathroom accidents.

**{¶372}** Arguably, some portions of the improperly-admitted pieces of evidence were relevant to Kate's conviction for endangering A.S. via torture or cruel abuse. Brenda's hearsay testimony appeared to describe Kate punishing A.S. after a bathroom accident. The Nancy and Melissa emails described Kate yelling at A.S. and M.S. specifically about "potty training." Melissa's vouching related specifically to Nancy's hearsay statements in the email, further bolstering testimony that itself was improperly admitted.

**{¶373}** But this improperly-admitted evidence was not the only evidence

bolstering M.S.'s and N.S.'s testimony. M.S. and N.S. testified consistently about the facts supporting this endangerment charge. Nancy's email, though it described Kate screaming at A.S. and M.S., did not describe any of the abusive acts that gave rise to this child-endangerment charge. And none of the improperly-admitted evidence contained any allegation that Kate withheld food from A.S. as punishment or forced A.S. to take cold showers as punishment.

{¶374} Considering the errors in light of the remaining evidence, we hold that there was no cumulative error that would have changed the outcome on Count 23.

{¶375} Moving on, none of the improperly-admitted evidence contained any allegation that Kate hit M.S. or forced her to take cold showers as punishment. M.S. testified that the Snyders hit her as punishment for bathroom accidents, so the jury heard first-hand testimony from the victim of the crime about Kate's abusive acts, which was unique from any improperly-admitted evidence. We determine that no cumulative error affected Kate's conviction on Count 24.

{¶376} We overrule Kate's ninth assignment of error.

CONCLUSION

{¶377} For the foregoing reasons, we sustain Kate's sixth assignment of error in part, reverse her convictions for child endangerment under Counts 19 and 21, and discharge her from further prosecution on those charges. We overrule the remainder of her assignments of error. We sustain John's eighth assignment of error in part, reverse his child-endangerment convictions under Counts 8 and 10, and discharge him from further prosecution on those counts. We overrule the remainder of his assignments of error and affirm the trial court's judgments in all other respects. We remand the cause to the trial court to resentence the Snyders in light of our reversing their convictions in Counts 8, 10, 19, and 21.

Judgments affirmed in part, reversed in part, and cause remanded.

**ZAYAS, P.J.,** and **MOORE, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.